San Miguel, González y Valiente & Compañía, deman-
dante y apelante, *v.* Municipio de Caguas, demandado
y apelado.

Núm. 9722.—*Sometido:* Enero 13, 1950. *Resuelto:* Abril 9, 1951.

*E. Martínez Rivera* y *Luis Blanco Lugo,* abogados de la apelante; *Federico E. Virella,* abogado del apelado.

EN RECONSIDERACION.

EL JUEZ ASOCIADO SEÑOR NEGRÓN FERNÁNDEZ emitió la opinión del tribunal.

De nuestra sentencia de 10 de mayo de 1949, *San Miguel, etc. & Cía.* v. *Municipio,* 69 D.P.R. 960, solicitó reconsideración la demandante apelante en extensa moción que fué objeto de oposición en escrito a su vez igualmente extenso. Otros escritos adicionales fueron radicados por las partes. Las cuestiones planteadas en la referida moción han requerido un reexamen de los autos, tanto en cuanto a los hechos como en cuanto al derecho aplicable.

Por nuestra sentencia de 10 de mayo de 1949 confirmamos una dictada por la Corte de Distrito de Caguas declarando sin lugar demanda sobre cobro de dinero y otros extremos, instada por San Miguel, González y Valiente y Compañía, adquirentes por compra al Banco Territorial y Agrícola, en liquidación, por la suma de $2,500, de un crédito que a dicho banco fuera cedido por el ingeniero Robert R. Prann y que éste tenía contra el Municipio de Caguas por la suma de $12,384.63. [1] Esta suma representaba la diferencia entre la cantidad de $33,368.70 efectivamente pagada a Prann con cargo a la de $33,976.64, por la cual

---

[1] Aun cuando en la demanda se reclama la suma de $12,484.63, los créditos cedidos por el banco a la demandante—y que Prann traspasó al banco—hacen un total de $12,384.63, conforme a las certificaciones libradas al efecto. En el contrato de cesión entre el banco y la demandante, a pesar de especificarse las cantidades individuales de los créditos envueltos—$4,575.33 y $7,809.30—se consigna erróneamente la suma total de dichos créditos.

le fué adjudicada al mismo la buena pro en la subasta del Municipio de Caguas para la construcción de la planta de filtración del acueducto, y la liquidación final de la obra, hecha por el Comisionado del Interior, ascendente a la suma de $45,753.33, que fué el costo total de la misma bajo el contrato suscrito por el municipio y por Prann al efecto. [2]

---

[2] El texto íntegro del contrato es el siguiente:

"1.—Este contrato celebrado hoy día 3 del mes de febrero de mil novecientos treinta y uno, entre José Reguero González, Alcalde, como primera parte, y Robert R. Prann como segunda parte, HACE SABER: Que de acuerdo con el anuncio, instrucciones a los licitadores y pliego de condiciones aquí unidos y de acuerdo con la memoria y los planos archivados en la oficina del Ingeniero de Obras Municipales que forman parte de este contrato, el citado José Reguero González, Alcalde, por y en representación del Municipio de Caguas y el citado Robert R. Prann acuerdan y convienen entre sí lo siguiente:

2.—Que el significado de las siguientes palabras que aparecen en el presente contrato es aceptado por ambas partes:

"La palabra 'Departamento' o cualquier pronombre usado en su lugar, significará el Departamento del Interior del Gobierno de Puerto Rico. —La palabra 'Comisionado' o cualquier pronombre usado en su lugar, significará el Comisionado del Interior del Gobierno de Puerto Rico, o cualquier agente debidamente autorizado para representar el Gobierno de Puerto Rico en la ejecución del presente contrato.—Las palabras 'Superintendente de Obras Públicas' o cualquier pronombre usado en su lugar, significará el Superintendente de Obras Públicas del Departamento del Interior del Gobierno de Puerto Rico, o cualquier agente debidamente autorizado para representarlo en la ejecución del presente contrato.—La palabra 'Arquitecto', o cualquier pronombre usado en su lugar, significará el Arquitecto del Departamento del Interior del Gobierno de Puerto Rico, o cualquier agente debidamente autorizado para representarlo en la ejecución del presente contrato.—Las palabras 'Ingeniero de Obras Municipales' o cualquier pronombre usado en su lugar, significará el Ingeniero del Departamento del Interior encargado de las obras municipales, o cualquier agente debidamente autorizado para representarlo en la ejecución del presente contrato.—Las palabras 'Alcalde de Caguas' o cualquier pronombre usado en su lugar, significará el Alcalde de Caguas del Gobierno de Puerto Rico, o cualquier agente debidamente autorizado para representarle en la ejecución del presente contrato.—La palabra 'Inspector' o cualquier pronombre usado en su lugar, significará la persona debidamente autorizada que actúa en representación del Ingeniero de Obras Municipales y directamente encargada de la inspección de las obras que se ejecutan bajo el presente contrato.—La palabra 'Contratista' o cualquier pronombre usado en su lugar, significará la segunda parte de este contrato.

"3.—Que la segunda parte contratante suministrará y acopiará los materiales y ejecutará y proveerá la mano de obra necesaria para la com-

El dinero para la construcción de dicha planta de filtración provenía de un empréstito hecho por el Municipio de Caguas por la suma de $146,000, de la cual la de $80,000 fué en definitiva destinada a las mejoras del acueducto municipal. El contrato entre Prann y el municipio se formalizó el 3

pleta construcción y terminación de las obras de construcción—Contrato No. 1–E de la Planta de Filtración de Caguas, por la suma indicada en su proposición de fecha enero 23 de 1931 que asciende a un total de treinta y tres mil novecientos setenta y seis dollars con sesenta y cuatro centavos ($33,976.64) a los precios unitarios según su citada proposición.

"4.—Que la primera parte, por y en representación del Municipio de Caguas conviene en pagar a la segunda parte por todos los materiales suministrados y aceptados y por toda la mano de obra necesaria para la ejecución y terminación de la obra en la forma que requiere este contrato, los precios arriba mencionados y convenidos.

"5.—El citado Robert R. Prann comenzará la obra en o antes del día 23 de abril de 1931 y la terminará en o antes del día 23 de octubre de 1931.

"6.—Que las Condiciones Generales para la Contratación de Obras Públicas Insulares puestas en vigor desde el mes de junio (sic) de 1902, son aplicables a este contrato y forman parte del mismo.

"7.—El Ingeniero de Obras Municipales con la aprobación del Comisionado del Interior podrá ejecutar toda la obra o parte de ella para la cual se ha celebrado este contrato, si en su opinión no fuere satisfactorio el progreso de la obra; pagando directamente el Municipio de Caguas todos los gastos, los cuales se deducirán de cualquiera suma de dinero que se adeude o pueda adeudarse más adelante al contratista.

"8.—Si por cualquier motivo el contratista se demorase o dejase de comenzar el suministro de los materiales para la ejecución de la obra el día aquí estipulado, o si en la opinión del Ingeniero de Obras Municipales dejare de ejecutar fiel y diligentemente la obra de acuerdo con los planos, pliego de condiciones y demás requisitos de este contrato, entonces, en cualquiera de los casos la primera parte contratante o su sucesor legalmente nombrado podrá, con la aprobación del Comisionado del Interior, anular este contrato notificando al efecto por escrito a la segunda parte y al hacerse esta notificación el contrato quedará anulado, sujeto a lo dispuesto en las secciones 32, 33 y 34 de las Condiciones Generales para la Contratación de las Obras Públicas Insulares.

"9.—Se harán pagos mensuales al contratista durante el progreso de las obras en proporción al material suministrado y mano de obra ejecutada durante el mes con cargo a este contrato, reteniéndose el 10 por ciento de cada pago hasta la terminación total de las obras y su aceptación final, y siempre que se haya cumplido con todos los requisitos según está previsto en el Pliego de Condiciones Generales.

"10.—Ni este contrato ni ningún interés que afecte al mismo será transferido a otra persona o personas, y en el caso de que ocurriera

de febrero de 1931, por la suma indicada de $33,976.64, y fué aprobado por el Comisionado del Interior de Puerto Rico el 13 de abril del mismo año. Del mismo forman parte las "Condiciones Generales para la Contratación de Obras Públicas Insulares," puestas en vigor desde el mes de julio de 1902. (³)

 El primero de los fundamentos de la moción de reconsideración de la apelante impugna nuestra conclusión

dicha transferencia el Municipio de Caguas puede negarse a continuar este contrato bien fuere con quien hace la transferencia o con aquél a quien se haya transferido, pero todo derecho de acción por falta de cumplimiento de este contrato por parte del citado Robert R. Prann quedará reservado al Municipio de Caguas.

"Ninguna persona perteneciente a, o empleado en el servicio del Gobierno de Puerto Rico será, ni podrá ser admitida en parte alguna de este contrato o en cualquier beneficio que el mismo pudiera producir.

"11.—A ningún trabajador, obrero, mecánico empleado por un contratista, sub-contratista o cualquier persona que haga o convenga hacer la totalidad o parte de la obra, objeto de este contrato, se le permitirá u obligará a trabajar más de ocho horas diarias en cualquier día natural, con excepción de aquellos casos de emergencias extraordinarias causadas por incendio, inundación o peligro de pérdidas de vida o propiedad y dichos obreros, trabajadores o mecánicos empleados en cualquier obra pública insular, recibirán no menos de UN DOLLAR por cada día legal de trabajo efectuado.

"12.—Este contrato está sujeto a la aprobación del Comisionado del Interior.

"En testimonio de todo lo anterior, las partes contratantes firman de su puño y letra al pie y separadamente en la fecha arriba indicada.

| | |
|---|---|
| (fdo.) Roberto Colón | Dr. J. Reguero González |
| Testigo | Alcalde. |
| G. Wilson MacDow | Robert R. Prann. |
| Testigo | |
| Aprobado: Abril 13, 1931 | Guillermo Esteves |
| | Comisionado del Interior." |

(³) La Cláusula número 30 de dichas Condiciones Generales provee:

"Trabajo Extra.

"Cualesquiera alteración o modificaciones en el proyecto, que ocasionen trabajo no provisto en el contrato, serán consideradas como trabajo extra.

"No se concederá ninguna reclamación por trabajo extra a menos que tal trabajo haya sido previamente ordenado por escrito por el inge-

de que la reclamación del contratista Prann al Municipio de Caguas por trabajo extra realizado bajo el contrato de referencia debía considerarse como perdida por incumplimiento y como renunciada, ya que nada en los autos demostraba que dicho contratista hubiera presentado dicha reclamación al municipio en la "próxima cuenta mensual por trabajo extra". Sobre este extremo creemos que, en parte, le asiste la razón a la apelante. Veamos.

Según aparece del voluminoso récord ante nos, luego de comenzada la obra por el contratista Prann, y de acuerdo con los términos del contrato al efecto, al final de cada mes se expedía una certificación por el Superintendente de Obras Públicas del Departamento del Interior, quien recomendaba su aprobación al Ingeniero de Obras Municipales de dicho departamento, y era finalmente aprobada por el Comisionado, contentiva de un estado de la obra ejecutada y del

niero local con la aprobación del Superintendente de Obras Públicas, y que sobre los precios a ser pagados por tal trabajo extra se haya llegado a un acuerdo entre el ingeniero y el contratista y que tales precios hayan sido debidamente aprobados.

"Las reclamaciones por trabajo extra, al ser éste ordenado, serán presentadas y pagadas en la próxima cuenta (*estimate*) mensual por trabajo extra; de lo contrario dichas reclamaciones serán perdidas por incumplimiento (*forfeited*) y renunciadas.

"Las alteraciones o modificaciones en los detalles del trabajo que no envuelvan nuevos precios no serán consideradas como trabajo extra, y el contratista deberá realizar tales alteraciones o modificaciones bajo la dirección del ingeniero local a los precios fijados en el contrato; *Disponiéndose, sin embargo*, que dichas alteraciones y modificaciones no aumentarán las cantidades en exceso del 20 por ciento de los cálculos originales. Para todo trabajo en exceso del 20 por ciento de las cantidades originales ocasionado por tales alteraciones y modificaciones, el Negociado de Obras Públicas se reserva el derecho de celebrar un contrato escrito con el contratista para la ejecución de tal trabajo adicional a los precios que mutuamente se convengan o a realizar el mismo por día o en cualquiera otra forma que el Negociado así lo ordene. Empero, si cualesquiera alteraciones o modificaciones en el trabajo producen alguna disminución en el costo original o en las cantidades a ser utilizadas que no alcance al 20 por ciento, la reducción así efectuada no dará derecho al contratista a hacer una reclamación de daños y perjuicios por las ganancias dejadas de percibir con motivo de las alteraciones o del trabajo no ejecutado."

material acopiado por el ingeniero Prann para la misma en el transcurso del mes. En dicha certificación se hacía constar el costo por unidad y precio, con sus respectivos totales, de la obra ejecutada y del material acopiado, consignándose las cantidades que habría de retener el municipio, según los términos del contrato, equivalentes a un 10 por ciento de cada pago hasta la terminación total de la obra y su aceptación final. En virtud de estas certificaciones se expedía por el municipio libramiento de pago a favor del ingeniero Prann, que certificaba el Director de Obras Públicas del Municipio, aprobaba el Alcalde y autorizaba el Auditor Municipal, con cargo al empréstito de $146,000 ya mencionado, en su partida "Mejoras en el Acueducto". Las certificaciones antes mencionadas, luego de aprobadas por el Comisionado del Interior, eran enviadas por éste al Alcalde de Caguas para el trámite ya indicado.

Hasta el 30 de enero de 1932 se libraron seis certificaciones ascendentes a $33,377.15, de la cual cantidad hasta dicha fecha se pagó al ingeniero Prann $30,090.14 y se retuvo por el municipio, de acuerdo con los términos del contrato, la de $3,287.01. En ninguna de esas seis certificaciones se consignó que se hubiere realizado "trabajo extra" por el ingeniero Prann. La siguiente certificación, que es la número 7, comprende la obra ejecutada por el ingeniero Prann hasta el 27 de febrero de 1932 en un total de $3,699.18, de la cual $420.62 debían retenerse de acuerdo con los términos del contrato, y la suma de $3,278.56 pagarse al contratista. Es en esta certificación que por primera vez se consigna, bajo el título "Obra extra en exceso del 20%", una partida ascendente a la suma de $1,350. Esta certificación, luego de los trámites ordinarios seguidos para las anteriores en cuanto a su aprobación, fué remitida para su pago al Alcalde de Caguas el 10 de marzo de 1932. Hasta aquí la única cantidad por obra extra consignada en las primeras 7 certificaciones a favor del ingeniero Prann, fué la

de $1,350 ya mencionada, y ésta, por estar incluída en "la próxima cuenta mensual por trabajo extra", fué reclamada a su debido tiempo y no podemos convenir que la misma fué renunciada y perdida por incumplimiento.

Ninguna otra obra ejecutada hasta el 27 de febrero de 1932 por el ingeniero Prann fué considerada por éste, ni por el Superintendente de Obras Públicas del Departamento del Interior, ni por el Ingeniero de Obras Municipales de dicho departamento, ni por el Comisionado mismo, como "trabajo extra" ejecutado bajo los términos del contrato en vigor. Hasta la indicada fecha el total de la obra ejecutada por el ingeniero Prann, incluyendo la cantidad consignada por trabajo extra, lo fué por un valor de $37,076.33.

La última certificación expedida a favor de dicho contratista en cuanto a obra ejecutada, que es la número 8, constituye la liquidación final hecha de la construcción de la planta de filtración, y cubre el período hasta el 3 de junio de 1933. Dicha certificación asciende a la suma de $8,677 e incluye específicamente una partida de $2,843.57 por concepto de excavaciones en zanjas en "exceso sobre el 20%"; obras extras en la nueva presa por valor de $546, y en el alumbrado del edificio de la planta por valor de $370.50 y obras "por administración" por un valor de $1,049.65, lo que hace un total de $4,809.72 por concepto de obra extra. Ninguna otra obra ejecutada por el ingeniero Prann desde el 27 de febrero de 1932 hasta la terminación final de la planta de filtración, se consignó en la certificación número 8 como obra extra o en exceso del 20 por ciento. Por tanto, del total de $8,677 recomendado para su pago por dicha certificación número 8, hasta la terminación del proyecto, tan sólo la suma de $4,809.72 es la que debe considerarse como perdida por incumplimiento y como renunciada por Prann por no haber éste presentado su reclamación al municipio en la próxima cuenta mensual por trabajo extra, luego de ejecutada, según la Cláusula 30 de las Condiciones Generales. La diferencia entre la suma de $12,384.63 recla-

mada en la demanda y los $4,809.72 no reclamados oportunamente por Prann—y por lo tanto renunciados por él—o sea, la suma de $7,574.91, fué reclamada en tiempo y forma, pues de esta última tan sólo la de $1,350 fué consignada como trabajo extra en la certificación número 7, y ya hemos visto que se reclamó oportunamente. La suma de $6,224.91 corresponde a obra ejecutada en alteraciones o modificaciones del proyecto original, que no fué considerada por ninguna de las partes en el contrato como trabajo extra, según éste se define en la Cláusula 30 de las Condiciones Generales y que forma parte de dicho contrato. Como puede observarse de su texto, la referida Cláusula 30 define lo que se considerará *trabajo extra*, proveyendo: "Cualesquiera alteración [es] o modificaciones en el proyecto, que ocasionen trabajo no provisto en el contrato, serán consideradas como trabajo extra". Provee además que "Las reclamaciones por trabajo extra, al ser éste ordenado, serán presentadas y pagadas en la próxima cuenta (*estimate*) mensual por trabajo extra; de lo contrario dichas reclamaciones serán perdidas por incumplimiento (*forfeited*) y renunciadas." Sin embargo, seguidamente establece lo que *no se considerará* trabajo extra, al disponer que "Las alteraciones o modificaciones en los detalles del trabajo *que no envuelvan nuevos precios* no serán consideradas como trabajo extra, y el contratista deberá realizar tales alteraciones o modificaciones bajo la dirección del ingeniero local a los precios fijados en el contrato; *Disponiéndose, sin embargo*, que dichas alteraciones y modificaciones no aumentarán las cantidades en exceso del 20 por ciento de los cálculos originales." (Bastardillas nuestras.) Hasta aquí la citada Cláusula 30 excluye del concepto de trabajo extra las alteraciones o modificaciones que no conllevan variaciones en los precios consignados para las distintas unidades contenidas en el pliego de especificaciones que sirvió de base a la subasta y al contrato, siempre que las mismas no aumenten las cantidades correspondientes más allá del 20 por ciento de los cálculos origi-

nales. De suerte, pues, que no toda alteración o modificación, que conlleva aumento en el coste del proyecto es considerada trabajo extra pues sólo comprende las alteraciones o modificaciones que envuelvan nuevos precios, o sea precios distintos de los estipulados por unidad de obra o de material en los cálculos originales del proyecto además de aquellas alteraciones o modificaciones que, a los precios estipulados en el proyecto original, excedieran del 20 por ciento de dichos cálculos.

El requisito de la Cláusula 30 en cuanto a que las reclamaciones por trabajo extra serán presentadas y pagadas en la próxima cuenta mensual por trabajo extra o de lo contrario serán perdidas por incumplimiento y renunciadas, no puede referirse, por tanto, a alteraciones o modificaciones que no envuelvan nuevos precios siempre que las mismas no aumenten las cantidades en exceso del 20 por ciento en los cálculos originales.

Habiendo expuesto anteriormente la naturaleza de la obra ejecutada por el contratista Prann según las distintas certificaciones expedidas por los funcionarios competentes para hacerlo, y en vista del alcance limitado que la propia Cláusula 30 da al concepto de trabajo extra, forzoso es concluir que la única reclamación del contratista Prann que fué presentada fuera del término y por lo tanto renunciada por incumplimiento, es aquélla por la suma de $4,809.72 ya mencionada, que comprende obra en exceso del 20 por ciento por valor de $2,843.57, obra extra en la nueva presa por $546 y en el alumbrado del edificio de la planta por $370.50 y obra por administración por $1,049.65.

La anterior conclusión, sin embargo, no es suficiente para dejar sin efecto nuestra sentencia de 10 de mayo de 1949. Precisa que examinemos la otra cuestión suscitada por la apelante en su moción de reconsideración, que se refiere al pronunciamiento que a manera de *dictum* hicimos en nuestra opinión de igual fecha, citando el caso de *De la Cruz* v. *Gobierno de la Capital,* 68 D.P.R. 534, 545,

al efecto de que habiendo demostrado la prueba que cuando Prann terminó y entregó la planta de filtración la partida de $80,000 asignada para mejoras en el acueducto ya estaba agotada y que en los presupuestos posteriores jamás se hizo asignación de cantidad alguna para el pago del crédito reclamado, ello sería suficiente de por sí para desestimar la demanda. (4)

En verdad el caso de *De la Cruz* v. *Gobierno de la Capital*, supra, es distinguible del de autos. En aquél se trataba de la compra de unos solares sin que el municipio tuviera fondos de clase alguna para su pago cuando se celebró el contrato de compraventa, y dijimos, citando el caso de *Gayá* v. *Gobierno de la Capital*, 68 D.P.R. 281, que de acuerdo con el artículo 42 de la Ley núm. 99, aprobada el 15 de mayo de 1931, estableciendo un gobierno especial para la Capital de Puerto Rico, (5) no era exigible un contrato contra el Gobierno de la Capital a no ser que hubiera una asignación de fondos en el presupuesto para hacer frente a la obligación de pago que surgiera con motivo de tal contrato. (6) Igualmente dijimos, citando. los casos de *Torrellas* v. *Municipio*, 62 D.P.R. 217 y *González* v. *Municipio*, 61 D.P.R. 369, y el artículo 8, inciso 9, de la Ley núm. 53, aprobada el 28 de abril de 1928—Ley Municipal—que "al no haber asignación en el presupuesto para sufragar los gastos ocasionados por cualquier contrato celebrado por un municipio o por el Gobierno de la Capital, el contrato resulta *ultra vires* y nulo".

---

(4) También dijimos que "en la demanda no se alega la existencia de fondos en presupuesto para hacer frente a la suma reclamada."

(5) Dicho artículo provee:

"El gobierno de la capital no podrá incurrir en obligaciones o deudas adicionales a los créditos asignados en el presupuesto, con excepción en aquellos casos en que estos créditos puedan ser aumentados por medio de transferencias con cargo o· sobrantes de otras partidas, o por cualquier ingreso extraordinario que se provea con dicho fin."

(6) En dicho caso no se trataba de fondos especiales provenientes de empréstito.

Reiteramos ahora la regla que informan tanto los casos de *De la Cruz* y el de *Gayá*, así como los de *Torrellas* y *González*,[7] ya citados, en el sentido de que un contrato que se celebre con un municipio es *ultra vires* y nulo si al tiempo de la transacción no hay asignada suma alguna en el presupuesto municipal con el objeto de sufragar tal obligación. Pero lo cierto es que dicha regla no tiene sitio de aplicación en el presente caso, ya que contrario al *dictum* en nuestra opinión de 10 de mayo de 1949, el contrato celebrado entre el Municipio de Caguas y el contratista Prann no era nulo y sin valor alguno por cuanto el mismo se celebró con todas las formalidades de ley y bajo la autoridad conferida al Alcalde del Municipio de Caguas por el artículo 64 de la Ley Municipal,[8] existiendo a la fecha en que se celebró el mismo, la suma de $80,000 en una partida titulada "Mejoras en el Acueducto", como parte del empréstito que por la mayor suma de $146,000 contrató el Municipio de Caguas en el año 1928, y se consignó como tal en la ordenanza de empréstito de conformidad con las exigencias de

---

[7] En igual sentido véanse también *Humacao Lumber Co.* v. *Am. Surety Co.*, 59 D.P.R. 165; *Moscoso Hno. & Cía.* v. *Municipio*, 50 D.P.R. 188. *Cf. Serra* v. *Municipio de Ponce*, 47 D.P.R. 144; *Serra, Garabís & Co., Inc.* v. *Municipio*, 42 D.P.R. 469, modificado en 65 F.2d 691.

[8] Dicho artículo dispone, en lo pertinente:

"Todo municipio queda por la presente autorizado y se le confiere facultad bastante para disponer en la ordenanza correspondiente, como condición previa, para obtener anticipos o préstamos de El Pueblo de Puerto Rico, o para la conversión o remisión de títulos de deudas vigentes con El Pueblo de Puerto Rico, o para la emisión de bonos u otros títulos de débito autorizados por la ley, que cualquiera obra pública o mejora comprendida dentro de los fines de dicha ordenanza, el costo de la cual, en su totalidad o en parte, haya de llevarse a cabo con el producto de dicho anticipo o préstamo, o de la venta, enajenación, traspaso, pignoración o hipoteca de cualesquiera bonos u otros títulos de deuda, habrá de construirse con arreglo a los planos y especificaciones aprobados por el Comisionado del Interior y el municipio. En este caso, todo contrato para la construcción de dichas obras o mejoras públicas se hará por el Alcalde en representación del municipio, con la aprobación del Comisionado del Interior, y de conformidad con las leyes que regulan la construcción de obras o mejoras públicas municipales; . . ."

los artículos 64 y 8(3) de la Ley Municipal. Es evidente que no se trataba de una asignación contenida en el presupuesto anual, ni de fondos ordinarios del municipio, ya que el dinero proveniente de un empréstito, según el artículo 57 de dicha ley, "se dedicará exclusivamente a los fines que se especificaren en la ordenanza que autorice el empréstito", con ciertas excepciones en cuanto a los sobrantes que resulten después de realizados dichos fines. En igual forma, bajo el artículo 8(3) de dicha ley, los ingresos necesarios dispuestos por la ordenanza de empréstito, a los fines de la amortización del capital e intereses del mismo, constituyen un fondo especial o *trust fund*, aun cuando procedan dichos ingresos de contribuciones ordinarias. [9]

El contrato celebrado por el Municipio de Caguas y Prann no adolece del vicio de *ultra vires* ni resulta nulo, ya que a la fecha en que se celebró existía la partida de $80,000 contra la cual girar por la suma de $33,976.64—costo original del proyecto de construcción de una planta de filtración según las especificaciones bajo las cuales se anunció la subasta y se adjudicó su buena pro al ingeniero Prann—[10] así como por cualquier otra suma resultante de ampliaciones o modificaciones en dicho proyecto, ya que la Cláusula 30 de las Condiciones Generales a que antes hemos hecho mención autorizaba, bajo determinadas circunstancias y previo cumplimiento de ciertos requisitos, que se ampliaran o modificaran las obras en proceso de construcción y, como consecuencia necesaria, que se aumentara el costo total del proyecto. Tal fué lo convenido a ese respecto por las partes

---

[9] Para amortizar el empréstito en este caso se impuso una contribución especial sobre la propiedad.

[10] En la Cláusula número 26 de las "Instrucciones a los Licitadores y Condiciones Generales", bajo las cuales se anunció la subasta, y que permitía alteraciones y modificaciones en las especificaciones originales del proyecto, se dispone:

"Toda obra en exceso del veinte (20) por ciento del importe de dicho contrato será tratada de acuerdo con la sección 30 del Pliego de Condiciones Generales para la Contratación de Obras Públicas Insulares."

contratantes, cuando existía aún la partida de $80,000, proveniente de los fondos del empréstito flotado tres años antes. Si bien existe una estipulación en el récord en el sentido de que a la fecha en que se *terminó* y *entregó* la planta de filtración por el contratista Prann la partida de $80,000 asignada para las mejoras del acueducto ya estaba agotada, tal hecho no constituye defensa para el municipio demandado, pues el momento que determina la extensión y alcance de la obligación y su validez en tanto la pueda afectar la existencia o no de fondos para responder de la misma, es la fecha en que se celebra el contrato y no la fecha en que se termina la obra. Ninguna evidencia hay en el récord de que a la fecha en que se celebró ese contrato el remanente hasta la suma de $80,000 de la partida destinada, por la ordenanza de empréstito, a las mejoras al acueducto, luego de descontar los $33,976.64 ya indicados, hubiere sido invertida, o estuviere comprometida, para otras obras. El hecho de que el municipio, con posterioridad al contrato de Prann, distrajera o destinara parte o todo de dicho remanente a otras obras en el acueducto, no releva al municipio de su responsabilidad bajo los términos de dicho contrato. *Crisp County* v. *S. J. Groves & Sons Co.*, 73 F.2d 327, 96 A.L.R. 391; *Town of Covington* v. *Autrim Lumber Co.*, 252 Pac. 50. Véanse además *Wilson* v. *Gaston*, 141 Ga. 770, 82 S.E. 136; *School Dist. No. 8* v. *Home Lumber Co.*, 97 Okla. 72, 221 Pac. 433 y demás casos citados en la Monografía de 96 A.L.R. 397. *Cf. City of Healdton* v. *Blackburn*, 37 P.2d 311 y 159 A.L.R. 1261. Tampoco lo releva de responsabilidad el hecho—en que descansa gran parte de la argumentación del municipio apelado—de que el alcalde, luego de iniciadas las obras, y con motivo de ciertos cambios y obras extras que fueron ordenados por el Departamento del Interior, por carta de 15 de agosto de 1931 dirigida al contratista Prann situó en dicho departamento toda la responsabilidad por los cambios ordenados. No era menester que

el alcalde así lo hiciera, pues según los términos del contrato la supervisión y aprobación de la obra quedó en manos del Comisionado del Interior quien, a los fines de la responsabilidad del municipio como parte contratante, era su agente en la ejecución de la obra a llevarse a cabo por Prann.

Hemos de suponer que la ley fué cumplida y que al aprobarse la ordenanza autorizando el empréstito por la suma de $146,000 se especificó en la misma "las obras o servicios que hayan de realizarse y su importe correspondiente". Artículo 8(3), Ley Municipal. Así pues las únicas defensas del municipio contra la reclamación de Prann —en lo que concierne a la cantidad de fondos asignados para la realización de la obra—era la de que dicha reclamación trascendía o pasaba del importe que para las "Mejoras en el Acueducto" se consignó en la ordenanza de empréstito, o que el remanente, luego de descontada la suma especificada en el contrato como costo original del proyecto, había sido invertida o estaba ya comprometida, a la fecha en que se formalizó el contrato entre el municipio y Prann, para otras "Mejoras en el Acueducto". Tal alegación constituiría una defensa afirmativa del municipio demandado. *Gayá* v. *Municipio*, supra; *Tomasini* v. *Municipio de Ponce*, 50 D.P.R. 804; *Serra* v. *Municipio de Ponce*, 47 D.P.R. 144. No era necesario tampoco que se alegara en la demanda existencia de fondos en el presupuesto—pues no se trata de obligaciones o deudas a ser afrontadas con asignaciones presupuestales ordinarias. Ya hemos visto que la prueba tan sólo reveló que la partida de $80,000 estaba agotada a la fecha de *terminación y entrega* de la planta de filtración. [11] En tal situación de hechos la reclamación del demandante no

[11] El municipio apelado así se expresa en un alegato complementario en el caso y en su oposición a la Moción de Reconsideración:

"Si bien al tiempo de la transacción había dinero, lo cierto es que en el momento de la entrega la partida asignada en el presupuesto especial para dicho fin había sido agotada y por tanto conforme al artículo 8 inciso 9 de la Ley Municipal de 1928 no se puede incurrir en obligaciones ni deudas fuera de los créditos asignados en presupuesto."

puede ser derrotada, pues ante los términos del contrato y de la Cláusula 30 de las Condiciones Generales que forma parte del mismo, y la existencia de fondos a la fecha de su formalización, la obligación contraída era exigible contra el demandado, por no existir vicio. alguno de ilegalidad en la misma.

Resueltas a favor del apelante las dos cuestiones principales suscitadas en su moción de reconsideración, es inevitable dejar sin efecto nuestra sentencia de 10 de mayo de 1949, revocar la dictada por la corte inferior y declarar con lugar la demanda en aquella parte de la suma reclamada que no fué perdida por incumplimiento del contratista. Las defensas especiales planteadas en su contestación por el municipio demandado le fueron adversamente resueltas por el tribunal inferior—no obstante dictar éste sentencia a su favor declarando sin lugar la demanda—al prosperar su defensa de que Prann perdió su derecho a reclamar la misma en su totalidad por no haberlo hecho oportunamente, de acuerdo con la Cláusula 30 de las Condiciones Generales. A lo dicho por el tribunal inferior en sus conclusiones sobre dichas defensas, nada habremos de agregar.

*En consecuencia, se dejarán sin efecto nuestra opinión y sentencia de 10 de mayo de 1949 en el caso de autos; la sentencia dictada por la corte inferior el 8 de abril de 1946 será revocada y se dictará otra declarando con lugar la demanda condenando al municipio demandado a pagar a la demandante la suma de $7,574.91, con intereses al tipo legal desde el 6 de noviembre de 1933, fecha en que, ya entregada y aceptada definitivamente la obra, se remitió para su pago al municipio demandado, por el Comisionado del Interior —por él aprobada y finalmente liquidada—la reclamación de Prann, más las costas.*