VENANCIO MORALES ET AL., demandantes y recurridos, *v.* MUNICIPIO DE TOA BAJA, demandado y recurrente.

*Número:* R-82-351     *Resuelto:* 25 de noviembre de 1987

*Etienne Totti Del Valle*, de *Laffitte & Domínguez*, abogado del recurrente; *José H. Rivera Cintrón*, abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR ORTIZ emitió la opinión del Tribunal.

El Tribunal Superior, Sala de Bayamón, dictó sentencia en que condenaba al Municipio de Toa Baja a satisfacer al demandante la suma de $179,115, los intereses legales a partir del 1ro de enero de 1977 y $6,000 por concepto de honorarios de abogado. A solicitud del municipio acordamos revisar dicha sentencia. Revocamos.

## I

La controversia esencial ante nos es si el tribunal erró al aplicar, bajo los hechos particulares de este caso, la doctrina de enriquecimiento injusto a favor del contratista demandante.

■ En *Plan Bienestar Salud* v. *Alcalde Cabo Rojo*, 114 D.P.R. 697, 703 (1983), esbozamos las normas a seguir en estas controversias. Son las siguientes:

En resumen, estimamos prudente aclarar las normas siguientes, sin pretender agotar el catálogo de los múltiples principios que rigen el enriquecimiento sin causa:

1a. La doctrina del enriquecimiento injusto es aplicable, dentro de determinadas situaciones, a los órganos administrativos.

2a. La aplicación de la doctrina dependerá de las circunstancias específicas de cada caso. El Código Civil no agota las situaciones a las que la doctrina se extiende.

3a. La doctrina del enriquecimiento injusto no es invocable cuando su efecto es vulnerar un principio importante de orden público encarnado en la Constitución o las leyes del país.

4a. La doctrina es invocable, entre otras circunstancias, cuando no se han observado ciertas formalidades de ley fácilmente subsanables o susceptibles de haber sido ejecutadas con el asesoramiento debido.

■ Al aplicar estas normas debemos, además, tomar en consideración que:

...conforme el Art. 1207 del Código Civil, "[l]os contratantes pueden establecer los pactos, cláusulas y condiciones que

tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni el orden público". 31 L.P.R.A. sec. 3372. A su vez, "los contratos. . .con causa ilícita no producen efecto alguno. Es ilícita la causa cuando se opone a las leyes o a la moral". Art. 1227 del Código Civil, 31 L.P.R.A. sec. 3432. Véanse: *Sánchez Rodríguez* v. *López Jiménez*, 116 D.P.R. 172 (1985); *Hernández Usera* v. *Secretario de Hacienda*, 86 D.P.R. 13, 18–25 (1962). *In re Pagán Ayala*, 117 D.P.R. 180, 187 n. 4 (1986).

■ Cobra vigencia también el principio rector del Art. 4 del Código Civil, 31 L.P.R.A. sec. 4, de que son nulos los actos ejecutados contra lo dispuesto en la ley, salvo los casos en que la misma ley ordene su validez, bajo el cual consistentemente hemos resuelto que las cláusulas de los contratos no pueden ser contrarias a las leyes, a la moral ni al orden público. *Reyes* v. *Jusino*, 116 D.P.R. 275, 287 (1985); *Flores* v. *Municipio de Caguas*, 114 D.P.R. 521 (1983); *Umpierre* v. *Torres Díaz*, 114 D.P.R. 449 (1983).

## II

Venancio Morales y la sociedad de gananciales que tenía constituida con su esposa, instaron demanda en cobro de dinero contra el Municipio de Toa Baja, para reclamar el pago de $190,000 por concepto de obras realizadas por el contratista demandante y aceptadas por el municipio demandado, en virtud de varios contratos verbales acordados entre el demandante y el anterior Alcalde, señor Ibáñez.[1] Los contratos verbales y las obras fueron hechas pocos meses antes de las elecciones de 1976. Al perder las elecciones el Partido Popular Democrático y el Alcalde Ibáñez, el nuevo Alcalde, electo como miembro del Partido

---

[1] A tenor con las alegaciones, estipulaciones de las partes y la prueba presentada, estas obras principalmente correspondían a las adicionales que se acordaron vía el mecanismo de órdenes de cambio (*change orders*).

Nuevo Progresista, rehusó honrar los compromisos de la anterior administración. Luego de un extenso trámite, se inició el juicio plenario. Durante el turno de prueba del demandado, las partes estipularon que:(²)

> ...[E]l Municipio demandado no elevó a escrito los contratos efectuados con el contratista demandante. Tampoco el Municipio demandado cumplió con la Ley Municipal de llevarse correctamente el sistema de contabilidad ni de notificarse al Contralor de Puerto Rico, lo relativo a dichos contratos. Que de igual forma el Municipio demandado tampoco cumplió con otras disposiciones de la Ley Municipal, relativas a la documentación y contabilidad pertinente y que no había partida presupuestaria para los contratos verbales objeto de la presente demanda. Apéndice, pág. 6.

En relación con la forma en que surgió la deuda reclamada son ilustrativas y representativas las determinaciones de hechos siguientes:(³)

> 2. Con fecha 17 de octubre de 1975, el Municipio Demandado y el Demandante Don Venancio Morales suscribieron el Contrato de Obras Públicas Número 1345, por la suma de $207,000.00, relacionado con el Centro de Diagnóstico y Tratamiento de Levittown de Toa Baja, Puerto Rico, luego del Demandante haberse llevado la buena pró de la correspondiente subasta.
> 3. El Demandante cumplió a cabalidad su obligación contractual relacionada en el apartado anterior. El Municipio Demandado le honró al Demandante la antes mencionada suma de $207,000.00, por la obra efectuada conforme a lo convenido. Dicha suma de dinero no es objeto de controversia en este caso.
> 4. Para mediados de 1976, estando la obra prácticamente para entregarse y en vísperas a las Elecciones, el Municipio

---

(²) Luego del tribunal determinar que no era necesario continuar con los testimonios sobre las distintas violaciones a la Ley Municipal y los reglamentos vigentes.

(³) Las determinaciones sobre las restantes partidas son, salvo la naturaleza de las obras y las cuantías envueltas, similares.

Demandado entendió que era beneficioso para su comunidad hacerle mejoras adicionales a dicho Centro de Diagnóstico.

5. El entonces Alcalde, Sr. Ib[á]ñez, con la autorización de la mayoría de los Asambleístas municipales, contrató verbalmente con el Contratista Demandante las mejoras a efectuarse en dicho Centro.

6. El Sr. Ib[á]ñez, a nombre del Municipio Demandado, pactó con el Contratista Demandante para llevar a efecto unas mejoras adicionales, (Change Orders) en el Centro de Diagnóstico y Tratamiento, por la suma de $90,000.00, desglosados de la siguiente manera:

1. Para habilitar la segunda planta y así aumentar la capacidad de dicho edificio .................................. $23,000.00
2. Para instalar un foso del ascensor en la primera planta ..................... $ 1,800.00
3. Para instalar 8 nuevas cerraduras en la primer[a] planta..................... $    200.00
4. Para la construcción de un área de parqueo o estacionamiento ........... $45,000.00
5. Para la construcción de un sistema de alcantarillado sanitario .............. $20,000.00
              TOTAL............... $90,000.00

(Escolios omitidos.) Apéndice, págs. 7–8.

Como hechos presentes en todas las transacciones el tribunal determinó que:

48. Todas las obras, objeto de la presente Demanda, y realizadas conforme a lo convenido que ascendieron a $190,000.00, fueron objeto de contratación verbal entre el Contratista Demandante y el Municipio Demandado, representado por su Señor Alcalde, con el asesoramiento técnico de su Ingeniero Consultor.

49. El Municipio Demandado no elevó a escrito el Contrato, objeto de la presente Demanda, porque se trataba de año de Elecciones en que no podía gastarse más del 50% de su presupuesto anual.

50. El Contratista Demandante descansando en la buena f[e] del Municipio Demandado, por conducto de su Señor

Alcalde, aceptó el Contrato verbal de llevar a efecto las obras por dichos $190,000.00 condicionado a que cobraría su dinero al comenzar el próximo año de 1977.

51. El Municipio Demandado y el Contratista Demandante ya habían establecido desde el año 1940, con todos los Alcaldes de turno, una relación y costumbre de trabajo a base de contratos verbales. Dichos contratos posterior a ejecutarse la obra se elevaban a escrito o se dejaban sin suscri[bir] pero siempre el Municipio Demandado le honró las deudas al Contratista Demandante.

52. En año eleccionario el Contratista Demandante y el Municipio Demandado habían establecido la costumbre y norma de trabajo de llevar a efecto y realizar obras, con carácter de urgencia, sin subasta y sin contrato escrito alguno. Pasadas las Elecciones el Municipio Demandado le pagaba fielmente y sin problemas al Contratista Demandante. Esta norma se estuvo estableciendo por los últimos 37 años.

. . . . . . . .

62. Al perder las Elecciones el Alcalde Ib[á]ñez Ortega, en noviembre de 1976, el Contratista Demandante le presentó las Certificaciones de Cobro de las obras realizadas, objeto de la presente Demanda. El entonces Alcalde prefirió no recibir dichas Certificaciones para que el Contratista Demandante las sometiese en enero de 1977 al nuevo incumbente municipal. Reafirmó su posición de que el Municipio Demandado venía obligado a pagarle al Contratista Demandante por las obras realizadas, de conformidad a lo convenido.

63. Tan pronto juramentó su posición el nuevo Alcalde, el Contratista Demandante se personó a la Casa Alcaldía y requirió se le pagasen las sumas objeto de la presente Demanda.

64. El actual Alcalde solicitó tiempo adicional del Contratista Demandante en tres distintas ocasiones y finalmente no aceptó las Certificaciones que el Contratista le presentó. Apéndice, págs. 12–14.

Como cuestión de derecho, concluyó el tribunal que:

El causante de *una ilegalidad* no puede ampararse en la misma para levantar una defensa o una causa de acción. Así

se expresa en un viejo principio de Derecho recogido por la máxima *NEMO AUDITUR SUAM TURPITUDINEM ALLEGANS*, vigente en nuestro Derecho.

"El autor o participante del acto ilícito no puede recurrir al juez en demanda de su nulidad." *Rubio Sacarello* v. *Roig*, 1962, 84 DPR 344.

Este principio es parte de las más amplias doctrinas por lo que no se permite a una persona ir contra sus propios actos. (Véase Diez-Picazo *"La Doctrina De Los Propios Actos"*, Bosch, Barcelona, 1963, página 39[,] doctrina vigente en nuestro derecho a través del Artículo 7 del Código Civil, 31 LPRA 7, según lo han reconocido numerosos casos de nuestro más alto Tribunal, entre ellos el de *Int. General Electric* v. *Concrete Builders*, 1976, 104 DPR 871. (Énfasis del original.) Apéndice, pág. 16.

En forma inconsistente con la anterior conclusión y sus propias determinaciones de hechos sobre la legalidad de los contratos objeto de la acción, cita la siguiente norma general.

"El Código Civil presume que todo contrato tiene causa y que ésta es lícita a menos que esa presunción sea destruida por prueba en contrario." *Ledesma Marrero* v. *Ledesma Marrero*, 84 DPR 167. Apéndice, pág. 18.

Señalamos esta discrepancia, ya que de un examen integral de la sentencia se desprende que el tribunal de instancia resolvió y partió de la premisa de que las actuaciones del ex Alcalde, señor Ibáñez, y los otros funcionarios eran ilícitas. Por eso es que la determinación de responsabilidad gubernamental está para todos los efectos, únicamente basada en la doctrina de enriquecimiento injusto.[4]

---

[4] Lo que determinó el tribunal fue que el contratista demandante no era responsable de los actos ilícitos de los funcionarios municipales y que no se le debía penalizar por los mismos.

El tribunal determinó que el Alcalde Ibáñez y sus representantes violaron varias disposiciones fundamentales de la Ley Municipal de 1960. En primer lugar el Art. 66 de la ley, 21 L.P.R.A. ant. sec. 1454, que prohíbe que se incurran, entre 1ro de julio del año en que se celebren elecciones generales y la fecha de toma de posesión de los nuevos funcionarios electos, obligaciones o gastos que excedan del 50% de la asignación presupuestaria de cada partida. Las obligaciones contraídas en este caso no caen bajo las excepciones que establece dicho artículo.(5)

También se contravino el Art. 74 de dicha ley, 21 L.P.R.A. ant. sec. 1462, que prohíbe incurrir en obligaciones o gastos en exceso de los créditos asignados en el presupuesto vigente.(6) El efecto de estas violaciones está claramente provisto en el Art. 78 (21 L.P.R.A. ant. sec. 1466).

---

(5) El cual, parafraseado, dispone lo siguiente:

Durante el período comprendido entre julio 1 del año en que se celebren elecciones generales y la fecha de la toma de posesión de los nuevos funcionarios electos en dichas elecciones generales, no se podrá incurrir en obligaciones o gastos que excedan del cincuenta (50) por ciento de la asignación presupuestaria de cada partida, y a tal fin el director de finanzas, el auditor o el secretario auditor, según sea el caso, deberá abstenerse de registrar o certificar ninguna orden que exceda la limitación fijada en esta sección; Disponiéndose, sin embargo, que esta limitación no se aplicará a las mejoras permanentes, ni a la compra y reparación de equipo, ni a la celebración de las Fiestas Patronales o días festivos, cuando se haya provisto partida separada en presupuesto para su celebración, ni aquellas partidas cuya inclusión en presupuesto es mandatoria, con preferencia a los gastos de administración, operación y mantenimiento de todas y cada una de las dependencias del municipio, según lo establece la sec. 1360 de este título, y ni a las retenciones que haga el Secretario de Hacienda en cobro de deudas estatutarias o contractuales contraídas con entidades del Gobierno Estatal. No obstante esta limitación, el municipio podrá, con la aprobación de no menos de dos terceras ($\frac{2}{3}$) partes del número de miembros de que se compone la Asamblea Municipal, incurrir en otros gastos y obligaciones que no excedan del sesenta (60) por ciento de la asignación presupuestaria de cada partida en el período antes mencionado. Una parte proporcional de un miembro se considerará como que requiere un voto adicional. Véase 21 L.P.R.A. ant. sec. 1454.

(6) Dicho artículo dispone que:

"No se podrá incurrir en obligaciones o gastos en exceso de los créditos asignados en cualquier presupuesto; Disponiéndose, que en casos de emergencia,

Cualquier contrato ejecutado en violación de este Subtítulo será nulo y quedará sin efecto, y, si se hubieren invertido fondos públicos, su importe podrá recobrarse a nombre del municipio en una acción adecuada incoada con tal propósito.

■ La nulidad de este tipo de obligaciones ha sido reconocida por este Tribunal en múltiples ocasiones.

En *Tomasini* v. *Municipio de Ponce*, 50 D.P.R. 804, 805 (1936), el demandante alegó que:

Tomasini instó la presente acción para recobrar la suma de $2,625.46 que se alegaba constituía el valor de cierto trabajo realizado por orden del Alcalde y Comisionado de Obras Públicas Municipales de Ponce. Sostenía que al terminarse el trabajo le había sido entregado al municipio, había sido aceptado por éste y estaba en uso desde diciembre de 1926. También alegaba que la asamblea municipal en enero de 1929 adoptó una resolución por la cual aceptaba el trabajo, reconocía su deuda por la suma de $2,625.46 con intereses a razón del 7 por ciento y ordenaba que se incluyera la misma en el presupuesto de 1929–30. La asignación que tenía por mira esta resolución no se hizo en el presupuesto de 1929–30 ni en ninguno otro.

La demanda fue desestimada. Resolvimos que las actuaciones del Alcalde eran *ultra vires* por no haberse celebrado una subasta según lo requería la ley entonces

_____

el alcalde podrá autorizar por escrito al director de finanzas o al secretario auditor a incurrir en gastos u obligaciones en exceso de los créditos asignados, hasta una cantidad equivalente al 5% de la suma total del presupuesto de gastos ordinarios. En su comunicación al director de finanzas o al secretario auditor, copia de la cual deberá ser enviada a la asamblea municipal, el alcalde hará constar los hechos que han motivado la emergencia; Entendiéndose por el término 'emergencia' un suceso o combinación ocasional de circunstancias que exijan inmediata actuación; Entendiéndose, además, que el monto de las deudas equivalentes al citado 5% se incluirán con carácter preferente en el próximo presupuesto.

"Nada de lo contenido en esta sección impedirá la celebración de contratos de arrendamiento o de servicios por períodos de tiempo que excedan el año presupuestario durante el cual se celebren dichos contratos; Disponiéndose, sin embargo, que ninguno de estos contratos deberá exceder del término de 5 años." 21 L.P.R.A. ant. sec. 1462.

vigente. Confirmamos bajo el supuesto de que del contrato no podía surgir una responsabilidad implícita por los beneficios recibidos.

En *González* v. *Municipio*, 61 D.P.R. 369 (1943), resolvimos que un contrato por servicios legales entre un abogado y un municipio es *ultra vires* y nulo de no existir asignación en el presupuesto del municipio para sufragar los gastos del mismo. Añadimos que estos contratos nulos no pueden ratificarse por pagos parciales de los servicios rendidos bajo los mismos.

La doctrina sobre nulidad cuando no hay partidas presupuestarias disponibles fue seguida en *De la Cruz* v. *Gobierno de la Capital*, 68 D.P.R. 534 (1948); *Gayá* v. *Gobierno de la Capital*, 68 D.P.R. 281 (1948), y *Torrellas* v. *Municipio*, 62 D.P.R. 217 (1943). También fue expresamente reiterada, aunque distinguida por los hechos particulares allí presentes, en *San Miguel, Etc. & Cía.* v. *Municipio*, 72 D.P.R. 391, 402 (1951).

## III

En conclusión, siendo nulas y *ultra vires* las actuaciones del municipio demandado, las mismas no pueden tener efecto a favor del contratista demandante.[7] Bajo las circunstancias presentes no pueden aplicarse las doctrinas de enriquecimiento injusto, actos propios y de impedimento en equidad. Ello violaría la política pública establecida en la Ley Municipal. *Infante* v. *Tribl. Examinador Médicos*, 84 D.P.R. 308, 316 (1961). Véase, además, *J.R.T.* v. *Hosp. de la Concepción*, 114 D.P.R. 372 (1983). En los casos en que hemos aplicado estos principios

---

[7] De las determinaciones de hechos se desprende que éste tenía conocimiento de que las obligaciones contraídas eran ilícitas, pero como a través de los años se habían convalidado o ratificado, confió en que se seguiría el mismo patrón. No contó con que el Alcalde perdería las elecciones.

de equidad contra el Estado, no estaba presente la violación de la política pública y menos aún de estatutos especiales en pro del orden público. Aun en esos casos estaban presentes circunstancias tales como las que clasificamos de "justa excepción" en *Carazo* v. *Srio. de Hacienda*, 118 D.P.R. 306 (1987). Para otros casos en que estaban presentes circunstancias excepcionales, véanse: *Berríos* v. *U.P.R.*, 116 D.P.R. 88 (1985), y *García Colón* v. *Srio. Hacienda*, 99 D.P.R. 779 (1971). Aquí las violaciones a las leyes, política pública y orden público son tan tajantes, *Figueroa Cancel* v. *E.L.A.*, 114 D.P.R. 684 (1983), que no hay cabida para la aplicación de los principios de equidad. Resolver en otra forma sería propiciar el craso incumplimiento por los funcionarios públicos de las leyes y reglamentos que rigen sus actuaciones.[8]

*Se revocará la sentencia recurrida y se declarará sin lugar la demanda.*

El Juez Asociado Señor Hernández Denton emitió un voto particular de conformidad. El Juez Asociado Señor Rebollo López no intervino.

—O—

Voto particular emitido por el Juez Asociado Señor Hernández Denton.

San Juan, Puerto Rico, a 30 de noviembre de 1987.

He votado conforme porque participo de la preocupación del Tribunal sobre la política pública encarnada en la Ley Municipal y reconozco que a pesar de la existencia material

---

[8] Sin que resolvamos que en el caso ante nos haya ocurrido, estaríamos alentando la corrupción gubernamental, lo cual afectará negativamente el orden moral y los valores fundamentales de la administración pública puertorriqueña. *Pueblo* v. *Bigio Pastrana*, 116 D.P.R. 748 (1985).

del empobrecimiento, la acción de enriquecimiento queda excluida en aquellos casos en que aquél es "imputable" al demandante. L. Diez-Picazo, *Fundamentos del Derecho Civil Patrimonial*, Madrid, Ed. Tecnos, 1979, Vol. 1, pág. 80. Hay varias ideas, sin embargo, sobre las que vale la pena insistir por la importancia preventiva que tiene aclarar cuál es la posición del individuo que contrata con los representantes de la administración pública, en clara violación a un régimen de derecho.

En los tiempos modernos, el instrumento más idóneo que tiene el Estado para adquirir del mercado bienes y servicios del más variado contenido es el contrato. El volumen e importancia de la contratación pública en Estados Unidos, por ejemplo, ha generado problemas jurídicos impresionantes. Este fenómeno creciente ha dado paso a una abundante legislación y a una institución jurídica que participa del derecho público y del privado. Bajo la rúbrica del *Public Contracts* o del *Government Contract Law*, la doctrina del contrato administrativo ha desarrollado progresivamente su propia técnica, tanto para el bien público como para la seguridad y garantía del ciudadano que desea competir y participar en los negocios con el Gobierno. Véanse, por ejemplo: *Armed Services Procurement Act of 1948* (10 U.S.C. sec. 2301 *et seq.*); *Federal Property and Administrative Services Act of 1949* (40 U.S.C. sec. 252 *et seq.*); 9 *Williston, Law of Contracts*, Cap. 12: *Government Contracts*, Boston, 1945; F. Trowbridge Vom Baur, *Differences Between Commercial Contracts and Government Contracts*, 1(2) Pub. C.L. J. 5 (1968); H. Leventhal, *Public Contracts and Administrative Law*, 52 A.B.A. J. 35 (1966); J. M. Whelan, E. C. Pearson, *Underlying Values in Government Contracts*, 10 J. Pub. L. 298 (1961); Schooner, *Impossibility of Performance in Public Contracts: An Economic Analysis*, 16(1) Pub. C.L. J. 229 (1986); Prevost, *Contract Modification vs. New Procurement: An*

*Analysis of General Accounting Office Decisions,* 15(2) Pub. C.L. J. 453 (1985); Woehr, *Agency Cancellation of Federal Contracts for Fraud and Conflicts of Interest,* 16(2) Pub. C.L. J. 386 (1987).

Razones históricas han impedido en ocasiones considerar al Estado moderno como un mero sujeto privado cuando contrata. El enfoque no puede subsistir en un marco donde a partir de los años cuarenta gran parte del presupuesto nacional se maneja a través de contratos. A. S. Miller, *Administration by Contract: A New Concern for the Administrative Lawyer,* 36 N.Y.U. L. Rev. 957 (1961); P. F. Hannah, *Government by Procurement,* 18 Bus. Law. 997 (1963); E. J. Stone, *Contract by Regulation,* 29 Law & Contemp. Probs. 32 (1964).

En España y en otros países europeos han ocurrido desarrollos similares en torno a los problemas jurídicos que suscita el encuentro entre la figura del contrato y la mecánica de los poderes administrativos cada vez más notables en nuestra sociedad. Véanse: J. I. Monedero Gil, *Doctrina del Contrato del Estado,* Madrid, Instituto de Estudios Fiscales, 1977; M. Hauriou, *La teoría del "riesgo imprevisible" y los contratos influídos por instituciones sociales,* 1926 Rev. Der. Privado, Núm. 148, pág. 4 (1926); A. Carretero Pérez, *El contrato administrativo ante la Ley de Bases de Contratos del Estado de 28–XII–1963,* 1964 Rev. Adm. Pública, Núm. 45, pág. 105 (1964).

En Puerto Rico en ausencia de régimen especial, y salvo "estatutos que modifiquen tal situación", los contratos administrativos se rigen por la teoría general de los contratos. *Plan Bienestar Salud* v. *Alcalde Cabo Rojo,* 114 D.P.R. 697, 699 (1983).

Según el Código Civil el contrato existe desde que una o varias personas consienten en obligarse, Art. 1206 (31 L.P.R.A. sec. 3371) se perfecciona por el mero consentimiento, Art. 1210 (31 L.P.R.A. sec. 3375) y éste se manifiesta

por el concurso de la oferta y de la aceptación, Art. 1214 (31 L.P.R.A. sec. 3401).

Las operaciones contractuales se nos presentan ordinariamente en la vida civil rodeadas de un gran dinamismo y simplicidad con apoyo en los principios liberales y espiritualistas que inspiran nuestro Código Civil. Ahora bien, en materia de contratos administrativos las normas administrativas revisten una excepcional importancia, de la misma forma que el Derecho Civil rodea de parecidas exigencias los contratos que celebran personas en "representación" de otras (menores, incapacitados, etc.).

En el campo público, los órganos administrativos no pueden realizar actos ni contraer otras obligaciones que las que autorizan las leyes, y tienen que ceñirse a lo que éstas indican. En otras palabras, el Alcalde del Municipio de Toa Baja no actúa como "titular" de los intereses públicos, sino sólo como su representante y defensor.

En la contratación pública hay siempre un interés público que es la causa profunda del negocio. Se pretende evitar, por ejemplo, que por impulso del juego contractual queden desbordadas las asignaciones presupuestarias. *De la Cruz* v. *Gobierno de la Capital,* 68 D.P.R. 534 (1948); *Gayá* v. *Gobierno de la Capital,* 68 D.P.R. 281 (1948); *Torrellas* v. *Municipio,* 62 D.P.R. 217 (1943).

Las normas legisladas y los procedimientos para la contratación de servicios que vinculan al Gobierno en su actuación, no constituyen meras guías para uso interno de los funcionarios. Su incumplimiento hace nulo el contrato. Por otra parte, cuando los particulares contratan con el Gobierno tienen la obligación de conocer y respetar los requisitos básicos de contratación pública.

En el caso de autos hay un interés público dominante, con exigencias radicales e indiscutibles.

El Art. 78 de la Ley Municipal, 21 L.P.R.A. ant. sec. 1466, derogado en 1980, disponía:

Cualquier contrato ejecutado en violación de este Subtítulo será nulo y quedará sin efecto, y, si se hubieren invertido fondos públicos, su importe podrá recobrarse a nombre del municipio en una acción adecuada incoada con tal propósito.

Véase al presente, 21 L.P.R.A. sec. 3451(a). Por su parte, el Art. 20 del Código Civil, 31 L.P.R.A. sec. 20, expresa:

*Leyes que declaren nulos ciertos actos*

Cuando las leyes, para prevenir fraudes o por motivos de utilidad pública, declaren ciertos actos nulos, sus disposiciones no deben ser dispensadas o incumplidas por la razón de que haya sido probado que en la cuestión particular de que se trate no haya fraude o no resulte ser contraria a la utilidad pública. Véanse, también, el Art. 4 del mismo Código, 31 L.P.R.A. sec. 4, y el Art. 1207, ídem, 31 L.P.R.A. sec. 3372.

Atendida la nulidad del contrato, es preciso distinguir entre la teoría del enriquecimiento injusto y "el problema de los contratos ineficaces (inexistentes, declarados nulos, rescindidos, etc.), en los cuales, pese a la ineficacia, una de las partes ha realizado una prestación que por naturaleza es irrestituible (v. gr. un *facere*). La ineficacia no justifica que el otro contratante haga suya la prestación sin compensación alguna". L. Diez-Picazo, *Estudios sobre la Jurisprudencia Civil*, Madrid, Ed. Tecnos, 1973, Vol. 1, pág. 339; M. Cerdá Olmedo, "*Nemo Auditur Propiam Turpitudinem Allegans*", 1980 Rev. Der. Privado 1187, 1196 (Dic. 1980).

El demandante conocía o debía conocer los requisitos de ley. Había contratado antes con el municipio. Las normas estatutarias aplicables persiguen proteger el interés público y no a las partes contratantes. El contratista demandante no era neófito en asuntos de contratos de obras públicas con municipios. Sólo a él es imputable su empobrecimiento.

Por las razones que anteceden, he dado mi conformidad en el caso de epígrafe.