# 2009 DTA 110

**TRIBUNAL DE APELACIONES**
**REGIÓN JUDICIAL DE SAN JUAN**
**PANEL IV**

ESTADO LIBRE ASOCIADO DE PUERTO RICO
Apelante

v.

NEREIDA FALTO DE COLE, INC., *ET. AL.*
Apelada

-----------------------------------------

GAR HOUSING CORP.
Apelada

v.

ESTADO LIBRE ASOCIADO DE PUERTO RICO EN REPRESENTACIÓN DEL DEPARTAMENTO DE LA VIVIENDA PÚBLICA; ILEANA ECHEGOYEN; CARLOS G. LABOY DÍAZ; YAZMÍN M. SANTIAGO; LUZ E. BATISTA, ANTONIO HEREDIA; CARLOS ALBERTO LÓPEZ RIVERA, PERSIDA ROSARIO, CARLOS FOURNIER; JOHN DOE, RICHARD DOE
Apelantes

Núm. KLAN-09-00663

San Juan, Puerto Rico, a 4 de agosto de 2009

Panel integrado por su presidente, el Juez Arbona Lago,
el Juez Salas Soler y la Juez Colom García

Salas Soler, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

El 18 de mayo de 2009, el Estado Libre Asociado de Puerto Rico (ELA) en representación de la Administración de la Vivienda Pública (AVP) compareció ante este Tribunal solicitando la revocación de la Sentencia Sumaria Parcial emitida por el Tribunal de Primera Instancia (TPI), emitida el 11 de marzo de 2009. Mediante la misma, dicho foro dilucidó la controversia presentada ante si en el caso de *ELA v. Nereida Falto de Cole*, KAC 2003-817 (507), dictaminando sumariamente la naturaleza fija de la partida de *"Overhead"* contenida en cierto contrato de administración habido entre AVP y la recurrida GAR Housing Corp. (GAR).

## HECHOS

Los hechos de este caso se remontan al año 1999. Durante el referido año, la AVP llevó a cabo el proceso de adjudicación de la Subasta RFP-AVP-98-99-04 ("la Subasta"). Mediante la misma, la AVP procuró la contratación de servicios concernientes a la prestación de tareas de administración, operación y mantenimiento de trescientos veintitrés (323) residenciales de vivienda pública ubicados a través de toda la Isla. La Subasta se llevó a cabo mediante el mecanismo de *"Request for Proposal"*, el cual le fue notificado a toda entidad interesada en licitar mediante la publicación de un aviso en un periódico de circulación general el 1 de noviembre de 1998. Evaluadas las propuestas sometidas por las entidades interesadas en respuesta al *"Request for Proposal"*, el 22 de abril de 1999, AVP envió las acostumbradas cartas informando a los licitadores sobre la adjudicación de la subasta. (Ap. pp. 69-126). El 4 de febrero de 2000 emitió un Aviso de Adjudicación Enmendado. Subsiguientemente, la AVP suscribió contratos de administración ("Contratos de Administración") con las compañías **Nereida Falto de Cole**; S.P. Management Corporation; American Management Corporation; Housing Promoters, Inc.; **GAR Housing Corporation**; Cost Control Company; Peregrine Management Company; Miramar Property Management & Adm.; ERCO Enterprises, Inc.; M.J. Consulting & Development, Inc.; J.A. Machuca & Associates, Inc.; Westbrook Management; y Zeta Enterprises (en conjunto, "los Agentes Administradores"). Los Agentes de Administración administrarían las unidades de vivienda pública del Estado Libre Asociado de Puerto Rico en las quince (15) áreas en las cuales se dividió Puerto Rico para efectos de la adjudicación de la subasta.

En lo concerniente a este caso, a GAR se le adjudicó el Área VII de la Subasta, para lo cual suscribió un "Contrato de Administración" dirigido a la administración de los residenciales públicos ubicados en esa región a saber: Juan C. Cordero Dávila, Los Lirios, Gladiolas I; Villa España; Santa Helena, Torre de Francia;

Gladiolas II; Nemesio R. Canales; Emiliano Pol, Beatriz Lasalle y Jardines de Quintana. (Ap. pp. 134-219).

**Los Contratos de Administración eran idénticos con la única diferencia del área asignada a cada uno de los Agentes Administradores y la cantidad total que sería compensada a cada uno por las tareas de administración adjudicadas en la Subasta**. En lo particular, el Artículo 19 del Contrato de Administración detallaba la compensación a la cual tendrían derecho los Agentes Administradores incluyendo su margen de ganancia, o *"profit"*, fijo.

Conforme el citado Artículo, los desembolsos bajo los Contratos de Administración para cada uno de los Agentes Administradores estaban contenidos en la partida denominada *"Management Cost"*. El *"Management Cost"* estaba a su vez dividido en dos categorías principales: "Project Based Salaries" y "Management Fee". Mientras, el "Management Fee" estaba a su vez dividido en tres componentes: "Non-Project Based Salaries", "Overhead" y "Profit". A esos efectos, el Artículo 19.1 del Contrato de Administración disponía, en su totalidad:

*The PRPHA will pay the Management Agent as full compensation for Services required, performed and accepted under this Agreement a "Management Cost" of [specific price per contract] which conforms with the total fees in the management costs schedule (hereinafter the "Management Cost Schedules") attached hereto as Exhibit VI and incorporated by reference as if fully set forth herein. Management Fee includes overhead, profit and non-project based personnel salaries. Management Cost includes overhead, profit, non-project based personnel salaries and project based personnel salaries. Under no circumstances, the Management Fee will be changed or altered, unless specifically provided herein. The Management Agent will invoice the PRPHA monthly for Services rendered during the prior month in accordance with the Management Costs Schedule (see Addendums).* (Ap. pp. 164-165) **[1]**

Para mediados del 2001, la AVP se percató de que algunos de los Agentes Administradores no estaban documentando sus solicitudes de reembolso de la partida de *"Overhead"* bajo los Contratos de Administración. Es decir, al momento de facturar a la AVP por sus servicios bajo los Contratos de Administración, éstos procedían a dividir entre doce meses la cantidad anual de *"Overhead"* cotizada en su propuesta y mensualmente sometían a la AVP facturas de "Overhead" *pro forma* cobrando un doceavo (1/12) de dicha cifra total. **En resumen, todos los meses, los Agentes Administradores enviaban a la AVP una factura de "Overhead" *pro forma* por una cantidad fija,e idéntica de mes a mes, sin acompañar evidencia que acreditara los gastos incurridos bajo dicha partida**. Alegó AVP, que mediante este esquema, la agencia no tenía manera de determinar si las facturas sometidas por los Agentes Administradores reclamaban gastos en los cuales éstos realmente habían incurrido o si esos gastos se relacionaban con los gastos cotizados bajo la partida de "Overhead" en sus respectivas propuestas.

En vista de ello, el 9 de octubre de 2001, la AVP cursó una comunicación a los Agentes Administradores indicándole los documentos que éstos debían someter a la agencia como condición para el pago de facturas de "Overhead". En lo pertinente, la carta en cuestión indicaba que al momento de someter sus facturas de "Overhead" los Agentes Administradores deberían acompañarlas de: (i) evidencia de los gastos; (ii) copia de cheques firmados emitidos para el pago; y (iii) en caso de gastos compartidos con otras funciones no relacionadas con la operación como Agente Administrador distribuir los gastos y presentar análisis. (Ap. pp. 220-225).

La AVP alegó que con los documentos que los Agentes Administradores suministraron comenzaron a incluir en apoyo de muchas de sus facturas de "Overhead", gastos no cotizados por el Agente Administrador en su propuesta de "Overhead" para el Contrato; gastos inelegibles bajo la reglamentación aplicable (como la compra de bebidas alcohólicas); gastos no autorizados por los Contratos (incluyendo vehículos de lujo, prendas y otros gastos personales como revistas de vinos, etc.); gastos que, por su naturaleza y la de los Contratos de

Administración, le correspondía asumirlos a los Agentes Administradores (como por ejemplo, el pago de las fianzas requeridas por los contratos y auditorias anuales) y gastos resultantes de contrataciones con personas naturales o jurídicas con quienes los Agentes Administradores tenían algún conflicto de interés. AVP alegaba que lo anterior fue confirmado por la Oficina del Inspector General del Departamento de Vivienda Federal ("HUD"), por sus siglas en inglés en un Audit Report suscrito en relación con los Contratos de Administración, (Ap. pp. 226-289). Particularmente, en el documento en cuestión, dicha agencia concluyó, en lo pertinente:

"[w]e identified that the Management Agents incurred overhead expenditures of over $1,047.633 that were excessive, were not allowable and/or allocable to the public housing program, or violated the management contract. The expenditures included payments to identity-of-interest firms, purchase of gifts and flower arrangements, social gatherings, and donations." [2]

Debido a este informe, la AVP procedió a "retener" el pago de toda factura que entendía reclamaba el reembolso de pagos improcedentes y/o no evidenciados.

El **7 de febrero de 2003**, AVP presentó una demanda contra los Agentes Administradores (*Estado Libre Asociado de Puerto Rico v. Nereida Falto de Cole*, Civil Núm. KAC2003-817 (507), en la cual le solicitó al TPI una Sentencia Declaratoria que dictaminara cuál era la naturaleza de la partida de "*Overhead*" a la que tenían derecho los Agentes Administradores bajo los Contratos de Administración, es decir, si era una cantidad fija que no necesitaba documentación que apoyara el pago, o si era una de reembolso, con un tope fijo, pagadera previo la evaluación de evidencia del tipo de gasto incurrido. (Ap. pp. 290-411).

La AVP solicitó al TPI que **declarase que la partida de "*Overhead*"** bajo los Contratos de Administración era **una de reembolso, y no fija ("*fix fee*"),** por lo que la AVP estaba facultada, bajo los términos de los Contratos de Administración para: (1) rembolsar como "Overhead" únicamente aquellas facturas debidamente documentadas que reflejaran gastos razonables, elegibles, legales y permisibles relacionados a la Oficina Central de los Agentes Administradores y que fuesen atribuibles a la administración de los proyectos de vivienda pública en Puerto Rico; (2) requerir facturas documentadas previo al reembolso de la partida de "Overhead"; y (3) denegar reembolsos por partidas de "Overhead" cuando la AVP determinara que éstos correspondían a gastos ilegales, irrazonables, inelegibles y/o de otra forma no permitidos por los Contratos de Administración y/o la reglamentación aplicable.

Los Agentes Administradores contestaron la Demanda alegando que el "Overhead" pactado en los Contratos de Administración era una partida fija, amparándose en una lectura literal del Artículo 19.1 del Contrato de Administración, citado con anterioridad. Varios de ellos presentaron reconvenciones contra la AVP reclamándole el pago de las cantidades retenidas de sus respectivas facturas de "Overhead", (Ap. pp. 412-524). GAR fue uno de ellos, reclamándole al tribunal que ordenara a la AVP a pagarle la suma de **$863,410.73** facturada como "Overhead" en el período posterior a las instrucciones impartidas por la agencia el 9 de octubre de 2001, la cual **había sido retenida por la AVP por entender que contemplaba gastos inaplicables y/o improcedentes**, (Ap. pp. 525-573). La AVP, oportunamente, presentó sus contestaciones a esas reconvenciones.

El 21 mayo de 2003, la AVP presentó una demanda Enmendada (Ap. pp. 5663-574). Los Agentes Administradores (incluyendo GAR) contestaron la Demanda Enmendada. Algunos presentaron reconvenciones enmendadas. La AVP presentó, a su vez, sus contestaciones a las reconvenciones enmendadas.

Particularmente, el 15 de julio de 2005, GAR presentó una Reconvención Enmendada (Ap. pp. 670-672), y la AVP presentó su Réplica a la misma el 15 de septiembre de 2003 (Ap. pp. 673-676).

Luego de varios incidentes, el 9 de julio de 2004, *Westbrook Management Co., y Housing Promoters, Inc.*

(dos de los Agentes Administradores demandados) presentaron una Moción de Sentencia Sumaria, (Ap. pp. 677-972). Alegaron, en síntesis, que los actos anteriores, coetáneos y posteriores a la firma de los Contratos de Administración demostraban que no existía controversia sustancial sobre hecho material alguno en cuanto a la naturaleza fija e invariable de la partida de "Overhead" pactada en los mismos. El 15 de julio de 2006, GAR presentó una Moción uniéndose a la Moción de Sentencia Sumaria presentada por los referidos co-demandados, (Ap. 973-1039).

El 8 de diciembre de 2004, la AVP presentó una "Moción en Oposición a Solicitud de Sentencia Sumaria Parcial" presentada por las co-demandada Westbrook Management Corp.

El TPI procedió a consolidar el pleito de *Estado Libre Asociado de Puerto Rico v. Nereida Falto de Cole*, *supra*, con el caso intitulado GAR *Housing Corp. Et als v. ELA Estado Libre Asociado de Puerto Rico et als*, Civil Núm. KAC04-1306 (507), el cual fue presentado por GAR el 27 de febrero de 2004. **[3]** En dicho pleito, GAR reclama, entre otras cosas, que la AVP le indemnice por los daños relacionados con la cancelación de su Contrato de Administración de GAR, por justa causa, mediante carta cursada el 24 de marzo de 2003. (Ap. pp. 1222 y 1237-1244, respectivamente). Ello, luego de que la AVP terminara el Contrato de Administración de GAR, por justa causa, mediante carta cursada el 24 de marzo de 2003, (Ap. pp. 1243-1244).

El 8 de diciembre de 2004, la AVP presentó una Contestación a Demanda Enmendada y Reconvención, (Ap. pp. 1245-1254). GAR contestó la Reconvención de la APV el 4 de enero de 2005, (Ap. pp. 1255-1259).

Luego de varios trámites procesales adicionales y de que las partes argumentaran las posiciones de sus respectivas Mociones de Sentencia Sumaria, mediante Orden en corte abierta dictada en una vista sobre el estado de los procedimientos celebrada el 23 de abril de 2008, el TPI ordenó a GAR y a la AVP a presentar una moción recapitulando el contenido de sus posiciones. Cónsono con ello, el 23 de mayo de 2008, GAR y la AVP presentaron una "Moción en Cumplimiento de Orden Exponiendo los Argumentos de las Partes en las Mociones de Sentencia Sumaria", que fuera Sometida al Tribunal en el caso de *Estado Libre Asociado de Puerto Rico v. Nereida Falto de Cole*, (Ap. pp. 1260-1572). El 11 de marzo de 2009, archivada en autos copia de su notificación el 19 de marzo de 2009, el TPI dictó sentencia sumaria aquí recurrida, (Ap. pp. 1.21).

El TPI concluyó que no era necesario que los Agentes Administradores sometieran facturas documentadas a la AVP como requisito al pago de "Overhead" **y ordenó a la AVP a pagarle a GAR la suma de $863,410.73, más intereses al tipo legal, por concepto del "Overhead" retenido durante la vigencia de su Contrato de Administración.**

En total desacuerdo con la *Sentencia Sumaria Parcial* dictada por el TPI, el Apelante acudió ante nos y alegó que el foro sentenciador incidió al:

A) *"Erró el Honorable TPI al considerar evidencia extrínseca para determinar cuál era la intención de la AVP y los Agentes de Administración, a pesar de entender que el contrato era claro y no ambiguo, y a pesar de la cláusula de integración contenida en los mismos la cual disponía que el propio lenguaje de los Contratos de Administración manifestaba la intención de las partes al contratar y dejar sin efecto cualquier negociación y/o representación previa en relación con los términos allí pactados."*

B) *"Erró el Honorable TPI al no concluir que tanto las cláusulas de los Contratos de Administración, evaluadas unas con las otras, como la reglamentación federal aplicable demuestran que la partida de "Overhead" contemplada en el "Management Fee" de los contratos es una partida de reembolso, con un tope máximo fijo, por lo cual la AVP tenia la obligación de evaluar la elegibilidad, razonabilidad y/o procedencia de los gastos que los Agentes Administradores someten bajo dicha partida, previo a proceder con el desembolso de los mismos."*

Con el beneficio de las posiciones de ambas partes y considerando sus planteamientos a la luz de la jurisprudencia, procedemos a resolver la controversia aquí presentada. Atendida la estrecha co-relación entre los señalamientos de error, procedemos a consolidarlos para su mejor disposición.

## EXPOSICIÓN Y ANÁLISIS

La Regla 36.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 36.2, faculta a toda persona que solicita un remedio mediante una demanda, reconvención, demanda contra coparte, contra tercero o sentencia declaratoria, a presentar una moción para que se dicte sentencia sumariamente sobre la totalidad o cualquier parte de la reclamación.

El objetivo principal de la sentencia sumaria es la solución de las controversias ante el Tribunal sin que sea necesario llegar a la etapa avanzada de un juicio. Claro está, enmarcado por el principio innegable que ordena alcanzar una decisión justa. Véase *Santiago Rivera v. Ríos Alonso*, 156 D.P.R. 181 (2002). Más aún, al resolver una moción de sentencia sumaria, el Tribunal **tiene que presumir que son ciertos todos los hechos no controvertidos** que se hacen constar en los documentos y las declaraciones juradas admisibles en evidencia, **y tiene que verlos de la forma más favorable para la parte que se opone a la moción,** concediéndole a ésta el beneficio de toda inferencia razonable que se pueda derivar de ellos". *Rivera Báez v. Jaime Andújar*, 157 D.P.R. 562, (2002). Así pues, la útil herramienta procesal de la sentencia sumaria debe utilizarse cuando el "promovente ha establecido su derecho con claridad y ha quedado demostrado que la parte promovida no tiene derecho alguno bajo cualquier circunstancia discernible de las alegaciones que no han sido refutadas." *García Rivera v. Enríquez Marín*, 153 D.P.R. 323 (2001). Véase, además, *Benítez Esquilín v. Johnson & Johnson, CPR*, 158 D.P.R. 170. Además, *"[p]rocede dictar sentencia sumaria solamente **cuando no existe una disputa legítima de hecho a ser determinada** y sólo resta aplicar el derecho." Benítez Esquilín, supra.* Véase, además, *Santiago Rivera, supra*; *Asociación de Pescadores de Punta Figueras, Inc. v. Marina de Puerto del Rey, Inc.,* 155 D.P.R. 906 (2001); *Pardo v. Sucn. Stella*, 145 D.P.R. 816 (1998); *Medina Morales v. Merk, Sharp & Dohme Química de Puerto Rico*, 135 D.P.R. 716, 726-27 (1994).

No obstante, es reiterada norma en esta jurisdicción que la sentencia sumaria es un remedio extraordinario y discrecional. Véase *García v. Darex P.R. Inc.*, 148 D.P.R. 364 (1999); *Audiovisual Language, supra*. La evaluación de los hechos, documentos y el derecho al momento de decidir si se emite la sentencia sumaria **está sujeto a lo que surja claramente del expediente con relación a si existen o no controversias de hechos materiales y al derecho aplicable**. En tal caso, al dictar sentencia sumaria, el Tribunal tendrá que: (1) analizar los documentos que acompañan la moción solicitando sentencia sumaria y los documentos incluidos con la moción de oposición y aquellos que obren en el expediente del tribunal; y (2) determinar si el oponente controvirtió algún hecho material o si hay alegaciones de la demanda que no han sido controvertidas o refutadas en forma alguna por los documentos.

Finalmente, el Tribunal **no deberá** dictar sentencia sumaria cuando: (1) existen hechos materiales no controvertidos; (2) hay alegaciones afirmativas en la demanda que no han sido refutadas; (3) surge de los propios documentos que se acompañan con la moción **una controversia real sobre algún hecho material**; o (4) como cuestión de derecho no procede. Véase, *Management Administration Services Corp. v. E.L.A.*, 152 D.P.R. 599 (2000); *PFZ Properties, supra*, 913-14.

En fin, el Tribunal Supremo ha reiterado que *"[s]i existe duda sobre los hechos o las controversias planteadas en las alegaciones, la solicitud de sentencia sumaria se debe resolver en contra del promovente. También, en circunstancias particulares, es preciso aplazar la disposición de una moción de sentencia sumaria hasta que se concluya el proceso de descubrimiento de prueba para que la parte promovida tenga la oportunidad de refutarla debidamente". Santiago Rivera, supra.*

**Surge claramente en el caso de autos que existe una controversia en cuanto a la interpretación del contrato entre AVP, GAR y los contratistas, por lo que no se debió dictar sentencia sumaria como tampoco sentencia sumaria parcial**. La controversia del presente caso versa sobre la partida de *"Overhead"* del *"Management Fee"* pactado en los *Contratos de Administración*. Corresponde determinar si el contrato que pactó el tope de la partida de *"Overhead"*, faculta a la AVP a solicitar evidencia a los Agentes Administradores como condición previa al pago de dicho de *"Overhead"*, si el mismo ocurrió o no, y si del contratista evidenciar el *"Overhead"*, qué cantidad tendría que pagar la AVP: a) el tope de la cantidad estipulada, o b) si es un reembolso de los gastos incurridos por el contratista.

Es norma reiterada que "la buena administración de un gobierno es una virtud de democracia, y parte de su buena administración implica llevar a cabo sus funciones como comprador con eficacia, honestidad y corrección **para proteger los intereses y dineros del pueblo al cual dicho gobierno representa.** [...] Los estatutos que regulan y ordenan la realización de obras y adquisición de bienes y servicios para el Estado, sus agencias e instrumentalidades y los municipios, tienen como propósito **la protección de los intereses y recursos fiscales del pueblo contra el dispendio, la prevaricación, el favoritismo y los riesgos del incumplimiento.**" *Colón v. Municipio de Arecibo*, Opinión del 28 de marzo de 2007, **2007 J.T.S. 68**.

La Ley Núm. 18 del 30 de octubre de 1975, según enmendada (en adelante Ley 18), dispone en su Artículo 1, 2 L.P.R.A. § 97, que todos los departamentos, agencias, instrumentalidades, oficinas, todo otro organismo y los municipios, están obligados, sin excepción alguna, a mantener un registro de todos los contratos que otorguen, incluyendo sus enmiendas, y deberán remitir copia de éstos a la Oficina del Contralor dentro de los quince (15) días siguientes a la fecha del otorgamiento del contrato o la enmienda. **Esta disposición refleja el interés legislativo de evitar pagos y reclamaciones fraudulentas o ilegales**, al crear un mecanismo de cotejo para perpetuar circunstancial y cronológicamente dichos contratos, y requiere que: (1) se reduzcan a escrito; (2) se mantenga un registro fiel con miras a *prima facie* establecer su existencia; (3) se remita copia a la Oficina del Contralor como medio de una doble constancia de su otorgamiento, términos y existencias, y (4) que se acredite la certeza de tiempo, esto es, haber sido realizado y otorgado quince (15) días antes. *Ocasio Berríos v. Rosa Carrasquillo*, 121 D.P.R. 37 (1988).

Como bien surge del expediente, en el caso que tenemos ante nuestra consideración, el contrato es uno de *"arrendamiento de obra"* entre AVP, GAR y otros contratistas. El contrato de arrendamiento de obra "es uno de trabajo mediante el cual una de las partes se encarga de hacer una cosa para la otra, mediante un precio convenido entre ellos [...] es uno de carácter consensual, **bilateral** y oneroso cuyos elementos característicos son la obra a realizarse y el precio". *Master Concrete v. Fraya*, 152 D.P.R. 616 (2000). A este arrendamiento se le ha llamado arrendamiento de industria, contrato de empresa, contrato de obra y más correctamente, según Diez Picazo, contrato de ejecución de obras. *Id.*, citando a I. Rubio San Román, *La Responsabilidad Civil en la Construcción*, Ed. Colex, 1987, pág. 55. El Apelante ha expuesto bien su teoría sobre lo antes expuesto.

Mediante este tipo de contrato, una parte se obliga hacia la otra a ejecutar una obra a cambio de la contraprestación convenida. *Master Concrete v. Fraya, supra*. El dueño de la obra es el encargado de pagar el precio en la forma, cuantía y tiempo convenido. De no haber pacto o costumbre en contrario, el pago deberá hacerse al momento de la entrega de la obra. *Id.*, Artículo 1490 del Código Civil, 31 L.P.R.A. § 4132. Por su parte, citando a Arco y Ponds, indicó el Tribunal Supremo en dicho caso de Master Concrete, *supra*, que **el contratista viene obligado a ejecutar la obra conforme a lo convenido en el contrato**, a las reglas del arte de la construcción y a los usos o reglas profesionales.

Teniendo en cuenta que:

"El Artículo 1044 establece- Las obligaciones que nacen de un contrato tienen fuerza de ley entre las partes contratantes;

El Art. 1207 ·establece- "[L]os contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni el orden publico"§ 3372;

Los Artículos 1210 y 1054 §§ 3375 y 3018– Una vez perfeccionado el contrato de arrendamiento de obras, las partes están obligadas por lo expresamente pactado y, de incurrir en dolo, negligencia o morosidad en el cumplimiento de sus obligaciones, éstas responden por los daños y perjuicios causados." ·

El citado articulado hay que aplicarlo al presente caso. [Código Civil, 31 L.P.R.A. § 2994 y sig.]

El contrato aquí en controversia, establece lo siguiente:

*"RECITALS*

*"WHEREAS, the PRPHA is a Public Housing Agency (hereinafter the "PHA") created by law to administer the Low Income Public Housing Program for the purpose of providing decent, safe, and sanitary housing under the United States Housing Act. of 1937, 42 U.S.C. 1437 et seq. (hereinafter the "Housing Act"), the regulations promulgated by the United States Department of Housing and Urban Development (hereinafter "HUD"), and the PRPHA's Organic Act, Section 1001 et seq. Law Number 66 of August 17, 1989, of title 17 of the Laws of Puerto Rico, as amended and all other applicable federal or local laws, rules, regulations and ordinances". ...*

*ARTICLE 1.*

*GENERAL DESCRIPTION OR RESPONSABILITIES AND SCOPE OF MANAGEMENTE AGENT'S BASIC SERVICES*

*1.3 Through the execution of this Agreement, **the Management Agent acknowledges** its role as an agent of the PRPHA and acknowledges **the public purpose and governmental nature of its contractual obligations.***

*1.4 The Management Agent **recognizes** that it **is dealing with public funds and properties and that it has a legal obligation to match that such public funds are only used for the public purposes specified herein.***

*ARTICLE 3.* .

*MANAGEMENT AGENT'S RESPONSABILITIES*

*3.1 A Management Cost shall be paid to the Management Agent **in consideration of the performance by the Management Agent** of certain Services with respect to the Projects, **including compliance with all of the Management Agent's obligations** hereunder, **as provided in Article 19 herein. The Management Agent shall provide the necessary resources** for the administration and operation of the Projects, including but not limited to, staffing of clerical, technical and professional personnel to manage the Projects according to sound public housing management practices, the applicable federal and local satutes and/or regulations, as well as the policies, procedures and directives of the PRPHA. **The Management Agent shall provide the PRPHA with** a list of the personnel and/or job positions and job descriptions of all of the personnel hired to provide the Projects' Service in connection with this Agreement.*

*3.2 **The Management Agent will have the following specific duties and responsibilities, together with any other requirements** included in the Proposal, the RFP, and all other **applicable federal or local laws and regulations:***

...

*F) The Management Agent shall prepare and submit reports to the PRPHA as directed by all applicable federal or local laws and regulations, as provided in Article 12 herein.*

*K) To deliver at the PRPHA's request, after the Agreement expiration or termination, all records,* equipment, and materials used during the execution of this Agreement, including, but not limited to, the information stored in computers, computer disks, related software, and any management information system used for the Projects. <u>This obligation to deliver immediately upon request, both the physical and operational control and related books, records and equipment, is not conditioned on the validity of the termination of the Agreement</u>.

*3.5 Except as otherwise provided in this Agreement, all of the Management Agent's bookkeeping, clerical, and other management overhead expenses* whether conducted at the Management Agent's outside the Project or elsewhere including the cost of office supplies and equipment, data processing services, postage, transportation for managerial personnel, and telephone services, **will be borne by the Management Agent's overhead portion of its Management Fee and/or from-his own funds** and will be treated as expenses pro-rated by unit to each Project and charged to the Operating Budget as part of the Management Cost. All accounting records with respect to these Services and expenses will be made available to the PRPHA upon request.

*ARTICLE 12.*

*RECORDS, REPORTS AND AUDITS*

*A. The Management Agent will furnish information as reasonably requested by the PRPHA from time to time, but at least once a month, with respect to the financial, physical, and operational condition of the Projects.*

*B. The Management will establish* and maintain for the Projects' operation a comprehensive system of *records, books, and accounts* according to applicable statues, regulations and sound business practices and *as required by the PRPHA. All records and books, including those prepared by the Management Agent for its own internal use to reflect its income and expense from this Agreement including the salary and benefits portion of the Management Fee will be subject to audit. And examination,* <u>with or without prior notice</u>*, at reasonable hours by any authorized representative of the PRPHA.*

*ARTICLE 19. PAYMENTS AND SANCTIONS*

*19.2 The PRPHA* <u>shall reimburse</u> *the Management Agent, on a monthly basis, conditioned to receipt of a properly documented invoice submitted by the Management Agent related to the Management Costs Schedule. The Management Agent shall invoice the PRPHA monthly for those expenses which the PRPHA has expressly agreed* <u>to reimburse</u> *herein.*

*19.28 The PRHA shall not be required to make any payments* to the Management Agent hereunder *unless the Management Agent has prepared and submitted to the PRPHA all reports required herein, in a form acceptable to the PRPHA.* Where *any required report is late, the sanction specified herein* <u>shall apply to the payment of the profit portion of the Management Fee</u>*.*

Section 20.12 Reports

*20.12.1 The Management Agent shall prepare and submit reports to the PRPHA as directed by the PRPHA.*

*20.13.1 The PRPHA retains an irrevocable right* to independently or through a third party **audit the Management Agent's books and records** pertaining to this Agreement and disallow any inappropriate billings *after giving reasonable written notice to the Management Agent*". (Énfasis, subrayados y relieves nuestros).

Como cuestión de derecho, el Tribunal Supremo de Puerto Rico estableció en *Venancio Morales v. Municipio de Toa Baja*, 119 D.P.R. 682 (1987), que:

"...*El causante de* una ilegalidad *no puede ampararse en la misma para levantar una defensa o una causa de acción. Así se expresa en un viejo principio de Derecho recogido por la máxima* NEMO AUDITUR SUAM TURPITUDINEM ALLEGANS, *vigente en nuestro Derecho.* ...

"... *El autor o participante del acto ilícito no puede recurrir al juez en demanda de su nulidad.*" 'Rubio Sacarello v. Roig, *1962,84 D.P.R. 344, 1962.*

En el voto particular emitido, el Juez Asociado Señor Hernández Denton, en *Venancio Morales v. Municipio de Toa Baja*, *supra*, expresó que:

"...*En la contratación pública hay siempre un interés público que* es la causa profunda del negocio. *Se pretende evitar, por ejemplo, que por impulso del juego contractual queden desbordadas las asignaciones presupuestarias. De la Cruz v. Gobierno de la Capital, 68 D.P.R. 534 (1948); Gaya v. Gobierno de la Capital, 68 D.P.R. 281(1948); Torrellas v. Municipio, 68 D.P.R. 217 (1943).*

"...*En Puerto Rico en ausencia de régimen especial, y salvo ""estatutos que modifiquen tal situación", los contratos administrativos se rigen por la teoría general de los contratos. Plan Bienestar Salud v. Alcalde Cabo Rojo, 114 DPR 697, 699 (1983).*

"...*En el campo público, los organismos administrativos* **no** *pueden realizar actos ni contraer otras obligaciones que las que autorizan las leyes, y tienen que ceñirse a lo que éstas indican.* ...

...Cuando las leyes, **para prevenir fraudes o por motivos de utilidad publica,** declaren ciertos actos nulos, sus disposiciones no deben ser dispensadas o incumplidas por la razón de que haya sido probado que en la cuestión particular de que se trate no haya fraude o **no resulte ser contraria a la utilidad publica**. Véanse, también, el Art. 4 del mismo Código, 31 L.P.R.A. sec.4, y el Art. 1207, *idem*, 31 L.P.R.A. sec.3372."

Al interpretar una disposición de una ley, en este caso, el contrato que obliga a ambas partes, se debe acudir siempre al texto de la ley, pues cuando éste es claro, no debe ser menospreciado bajo el pretexto de cumplir con su espíritu. Art. 14, Código Civil, 31 L.P.R.A. sec. 14; *Irizarry v. Johnson and Johnson*, 150 D.P.R. 155 (2000), pág. 614.

Es principio de *hermenéutica* que cuando el texto de la ley es claro y libre de ambigüedad, éste constituye "la expresión por excelencia de la intención legislativa". *Comité Pro Permanencia Barriada Morales v. Municipio de Caguas*, 158 D.P.R. 195 (2002), pág. 287; *Gobierno Municipal de Lares v. E.L.A.*, 155 D.P.R.697 (2001), pág. 444. Nuestro más alto foro ha señalado que es regla dorada de *hermenéutica* legal que las disposiciones de una ley deben ser examinadas e interpretadas en conjunto, de manera armoniosa, de modo que no conduzcan a resultados absurdos. *Caribe Comms., Inc. v. P.R.T.C,* 157 D.P.R. 203 (2002); *P.R.T.C v. J. Reg. de Tel. de P.R.,* 151 D.P.R. 269 (2000); *Pardavco, Inc. v. Srio. de Hacienda,* 104 D.P.R. 65, 71 (1975). A toda ley debe dársele la interpretación que mejor responda a los propósitos que persigue. Los tribunales deben interpretar la ley como un ente armónico, buscar el sentido lógico a sus diferentes disposiciones y suplir las posibles deficiencias cuando esto fuere necesario. *Pueblo v. Ruiz Martínez,* 159 D.P.R. 194 (2003), pág. 832.

El presente caso, devela una actitud inescrupulosa de personas que se hacen llamar "*servidores públicos*" y lo que hacen es aprovecharse de su posición en el sector público; la cual éste y ningún Tribunal puede legalizar ni mucho menos ser cómplices de tal comportamiento. Este comportamiento, que tantas veces hemos oído y visto, tiene un nombre y es "Corrupción". Es este comportamiento, el que priva a Puerto Rico de mayores beneficios

por parte de fondos provenientes de los Estados Unidos de Norte América y de instituciones financieras privadas a la hora de ofrecer garantías y ayudas a los puertorriqueños. Por lo antes expresado, es que resulta preocupante que la causa haya sido resuelta sumariamente, cuando entre otros factores se trata del uso de fondos públicos.

Primeramente, es difícil entender que la Sra. Ileana Echegoyen, Directora del Departamento de la Vivienda, en el momento de los actuales hechos, haya permitido que se desembolsara algún pago del *"Overhead"*, aquí en controversia, a los contratistas sin que éstos mostraran algún tipo de evidencia de haber incurrido en tal gasto, dando como excusa la *"Opinión Legal"* de un asesor. No hay que tener estudios especializados para saber que cuando se contrata con el Gobierno (en este caso AVP), el contratista tiene que evidenciarle al Gobierno todos los gastos incurridos, ya que la Oficina del Contralor de Puerto Rico es la facultada para auditar y verificar que estos gastos se realizaran. Además, los fondos para los trabajos contratados son de origen Federal, por lo que también son objeto de independiente auditoría por parte del Gobierno Federal. El Gobierno Federal, al conceder estas asignaciones de dinero a cualquier estado, requiere tener acceso a **toda** la información necesaria relacionada con el contrato por la cual se otorgó para asegurarse de que la ayuda dada sea utilizada correctamente. En la gran mayoría de las ocasiones es el propio Gobierno Federal el que redacta y suministra los contratos, aun cuando éste no intervenga directamente en su implementación. Un ejemplo de lo dicho, en el contrato habido entre AVP, GAR y los demás contratistas, que obligaba a los contratistas a proveer la información requerida por Puerto Rico Housing Administración (PRHA) o la AVP (las siglas en español), se establece en los Artículos 3, *"MANAGEMENT AGENT'S RESPONSABILITIES"*, Artículo 12. *"RECORDS REPORTS AND AUDITS"* y el Artículo 19. *"PAYMENTS AND SANCTIONS"* antes mencionados.

Aclarado que el contrato autoriza a AVP requerir de los contratistas cualquier información o comprobación de todo gasto dentro del término de su opción, debemos atender específicamente la situación del "Overhead". Es pertinente a la controversia de autos definir que es *"Overhead"*. Según definido por los tribunales federales: *"is a concept unique to construction contracting and is defined as **the additional costs incurred when a job's performance period is prolonged**"*. Southwestern Engineering Co. v. Cajun, 915 F. 2d 972, 978 (1990).

En el contrato que nos concierne, las partes pactaron únicamente respecto al tope o cantidad máxima del "Overhead" a cobrar por los contratistas. El que se haya pactado una cantidad máxima a pagar, no es sinónimo de que AVP hubiera pactado que el tope sería la cantidad a pagar en todo momento.

La controversia de si el *"Overhead"* es una cantidad fija o una de reembolso con un tope fijo, literalmente lo aclara el contrato en el Artículo 19, *"Payments and Sanctions"*, el cual dice lo siguiente:

*"**19.2 The PRPHA shall reimburse the Management Agent, on a monthly basis, conditioned to receipt of a properly documented invoice submitted by the Management Agent related to the Management Costs Schedule. The Management Agent shall invoice the PRPHA monthly for those expenses which the PRPHA has expressly agreed to reimburse herein.***

*19.28 The PRHA shall not be required to make any payments to the Management Agent hereunder unless the Management Agent has prepared and submitted to the PRPHA all reports required herein, in a form acceptable to the PRPHA. Where any required report is late, the sanction specified herein shall apply to the payment of the profit portion of the Management Fee."*

Claramente, el *"Overhead"* es una cantidad de reembolso con un límite máximo pre-establecido en el contrato. La razón o intención que tuvo el Estado para esta disposición contractual es velar y proteger el dinero público. Este tipo de estipulación en el contrato interesa evitar que los contratistas incurran en gastos superfluos o no relacionados al proyecto.

El TPI debió considerar los serios y graves señalamientos incluidos en la auditoría realizada, que fueron los

que obligaron a la AVP a pedir a los contratistas aquí señalados que presentaran la información antes mencionada. La auditoría señaló que:

"*Our assessment showed that the former PRPHA Administrator failed to ensure that the contracts awarded were procured in a manner providing full and open compensation consistent with the standards, and where reasonable and beneficial to the PRPHA. The PRPHA:*

*1. disregarded procurement requirements;*

*2. executed financially burdensome management contracts;*

**3. paid excessive non-project salaries;** *and*

**4. paid excessive overhead and profit.**

*We estimate these 5 year contracts to have been awarded at $35 million more than was necessary.*" (Ap. pág. 229)

"*...* **The overhead allowance paid by the PRPHA during fiscal year 200-2001 to GAR Housing,** *Housing Promoters and Westbrook Management* **totaled $2,152,657.00. We identified that the management agents incurred overhead expenditures of over $1,047,633.00 that were excessive, where not allowed and or allocable to the public housing program, or violated the management contract.**

"*... The management agents profit contracted for the 5year period* **was $36,264,643.00 and this also was excessive.** *The management agents did not have uniformity or consistency for the contracted profits. ...*". (Ap. pág. 230-231)

Reiteradamente, el Tribunal Supremo ha resuelto que a menos que exista pasión, prejuicio, parcialidad o error manifiesto, no debemos intervenir con la apreciación de la prueba hecha por el Tribunal de Primera Instancia. *Pueblo v. Soto González*, 149 DPR 30 (1999); *Méndez de Rodríguez v. Morales Molina*, 142 DPR (1996). Regla 43.2 de las de Procedimiento Civil, 32 LPRA Ap. III; *Monllor Arzola v. Sociedad de Gananciales*, 138 DPR 600, 610 (1995).

De la prueba en el expediente, surge claramente que existen hechos que tienden a contradecir abiertamente la conclusión a la cual llegó el TPI al dictar la sentencia, por lo que el Tribunal no debió adjudicar la controversia de la manera sumaria como lo hizo. Resulta evidente que no procedía que se dictara la sentencia sumaria parcial recurrida.

Del análisis del récord de esta causa, podemos concluir que medió error manifiesto, por parte del juzgador de los hechos. *Pueblo v. Collado Justiniano*, 140 DPR 107, 115 (1996).

Por los fundamentos antes expuestos, *revocamos* en su totalidad la *sentencia parcial* del 11 de marzo del 2009, aquí apelada. Se devuelve el caso al foro de instancia para continuación del trámite de conformidad a lo aquí resuelto. Se ordena a GAR Housing Corp. y los demás contratistas, que no presentaron los documentos pedidos por AVP y necesarios para justificar el "*Overhead*", los presenten.

Se ordena además al Tribunal de Primera Instancia que, luego del trámite de rigor, establezca con estos documentos la cantidad, si alguna, que se debe a los contratistas, y de haberse pagado alguna cantidad de dinero no justificable o en exceso a los gastos y desembolsos permisible, disponga para la restitución de dicha cantidad al erario público.

Así lo pronunció y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Dimarie Alicea Lozada
Secretaria Tribunal de Apelaciones

**ESCOLIOS 2009 DTA 110**

**1.** Los pagos efectuado por la AVP bajo los Contratos de Administración **provenían de asignaciones concedidas por el Gobierno Federal a los programas de vivienda pública.** Precisamente por ello, entre otras cosas, el conocimiento de las Regulaciones de HUD era uno de los factores a base de los cuales las propuestas para la Subasta serían evaluadas al momento de la licitación de la misma.

**2.** Véase, pág. iv de la Sección denominada "*Executive Summary*" en dicho documento).

**3.** Ello, luego de que la AVP fue transigiendo el pleito de *Estado Libre Asociado de Puerto Rico v. Nereida Falto de Cole* con todos los Agentes Administradores demandados. excepto GAR.