El Juez Asociado Señor Feliberti Cintrón
emitió la opinión del Tribunal.
Hoy examinamos si ciertas expresiones verbales atri-buidas al comisionado de seguros son suficientes para de-jar sin efecto las tarifas aplicables a los seguros de propie-dad para condominios, según aprobadas previamente por la Oficina del Comisionado de Seguros (OCS). Igualmente analizamos si, bajo los contornos de la doctrina de actos propios, le está vedado a los comisionados de seguros sub- *168 siguientes ir en contra de representaciones hechas por al-guno de sus antecesores.
I
Universal Insurance Company, Inc. (Universal o la pe-ticionaria) está facultada por la OCS a llevar a cabo nego-cios de seguros en Puerto Rico.
Allá para el 11 de julio de 2001, la OCS emitió una or-den de investigación con el propósito de verificar posibles violaciones al Código de Seguros por parte de Universal relacionadas al monto de las primas cobradas por la ase-guradora en seguros de propiedad para condominios du-rante el periodo trascurrido entre enero de 1996 hasta ju-nio de 2001. Cerca de un año más tarde, el 8 de mayo de 2002, el Ledo. Fermín M. Contreras Gómez, quien para esa fecha ocupaba el cargo de comisionado de seguros (Comi-sionado Contreras), emitió una orden en la cual consignó que, acorde a los hallazgos de la investigación, la peticio-naria cobró a algunos de sus clientes primas que estaban ya fuese por debajo o en exceso de las tarifas previamente aprobadas por la OCS para este tipo de seguro.(1) Con-forme a lo anterior, la OCS le ordenó a Universal a cesar y desistir de tal conducta; le impuso multas administrativas y le requirió devolver las cantidades cobradas en exceso a ciertos asegurados.
En respuesta, Universal solicitó la celebración de una vista administrativa, según provisto en el Art. 2.220(l)(c) y (2) del Código de Seguros entonces vigente, 26 L.P.R.A. sec. *169 222(1)(c) y (2).(2) En su escrito, argumentó entre sus defen-sas que durante la mayor parte del periodo investigado el entonces comisionado de seguros Juan Antonio García (q.e.p.d.) (Comisionado García),(3) alegadamente había sus-pendido el requisito de aprobación previa de tarifas para los seguros de propiedad sobre los condominios.
Previo a la vista administrativa, la OCS presentó ante el oficial examinador una Moción para que se Dicte Reso-lución Parcial Sumaria, en la que planteó que el asunto sobre las violaciones imputadas era apto para disposición sin necesidad de una vista. Universal, por su parte, se opuso argumentando, esencialmente, que existía una con-troversia fáctica sobre si el Comisionado García había sus-pendido o no el requisito de presentación de tipos para se-guros de propiedad sobre condominios, lo cual exigía la celebración de una vista evidenciaría.
Eventualmente, el oficial examinador acogió la solicitud de la OCS emitiendo una resolución parcial sumaria me-diante la cual determinó que la peticionaria cobró primas que no se ajustaban a los tipos inscritos y aprobados por la OCS, aplicables a los seguros de propiedad para condominios. De igual manera, dictaminó que el Comisio-nado de Seguros no había expedido orden alguna ni pro-mulgado regla o reglamento para suspender o modificar el requisito de presentación de tarifas atinente a los contra-tos de seguros de propiedad de condominios. Ratificó, por lo tanto, las violaciones al Código de Seguros imputadas en la orden impugnada por Universal, mientras que dejó pen-diente de determinación el importe de la multa que habría de imponérsele, así como el monto del rembolso correspon- *170 diente a las primas cobradas en exceso. Así las cosas, la OCS sometió nuevamente ante el oficial examinador una solicitud de resolución sumaria para disponer sobre el monto de la multa que habría de imponérsele a Universal y la cantidad que sería rembolsada a los asegurados.
Luego de varios trámites procesales, el 7 de diciembre de 2007, la entonces comisionada de seguros, Dorelisse Juarbe Jiménez, emitió una resolución sumaria mediante la cual le impuso a la peticionaria una multa administra-tiva de ocho mil dólares ($8,000) por haber cobrado primas en exceso a la tarifa manual en la suscripción de ocho pó-lizas de seguros de propiedad para condominios. Además, le impuso una multa administrativa de cuarenta y dos mil dólares ($42,000) por haber concedido rebajas no autoriza-das en la suscripción de veintiún pólizas de seguros de pro-piedad para condominios. Igualmente, le ordenó rembolsar la suma de ciento doce mil trescientos nueve dólares ($112,309) a aquellos asegurados a quienes se les había cobrado primas en exceso de la prima manual. Concluyó que la aprobación o inscripción de una tarifa para determi-nado tipo de contrato de seguro continuaba en vigor, mien-tras no fuese revisada formalmente y no se inscribiese la modificación correspondiente.
Inconforme, Universal acudió ante el Tribunal de Ape-laciones mediante recurso de revisión administrativa. Re-clamó la invalidez de las tarifas en controversia, alegando que la OCS había suspendido el requisito de aprobación previa de estas. Insistió en la aplicación de la doctrina de actos propios y cuestionó la disposición sumaria del asunto, argumentando que persistían controversias de he-chos medulares por resolver.
En su sentencia de 9 de abril de 2010, el Tribunal de Apelaciones confirmó la Resolución recurrida en todos sus extremos. Decretó que la suspensión de los requisitos de presentación de las tarifas en controversia únicamente po-día efectuarse mediante un proceso formal que culminase *171 en algún tipo de orden o reglamentación emitida por la OCS. Por lo tanto, las expresiones públicas del Comisio-nado García no eran suficientes para crear un nuevo es-tado de derecho. Consignó, además, que Universal no po-día descansar en la falta de fiscalización de la industria de seguros por parte del Comisionado de Seguros y presentar como defensa la doctrina de actos propios. Como parte de su dictamen resaltó el alto interés público que reviste este campo de nuestra economía, así como lo extensamente re-glamentado que se encuentra. A base de ello, concluyó que actuó correctamente la OCS al adjudicar sumariamente la disputa, puesto que no existía controversia sobre el hecho de que el requisito de presentación de tarifas continuaba vigente. Universal recurrió entonces ante este Foro por vía de certiorari.(4)
Expedido el auto de certiorari y habiendo comparecido ambas partes, procedemos a resolver.
II
En su alegato, la peticionaria aduce como error que el Tribunal de Apelaciones no reconoció que le cobija la doc-trina de actos propios como resguardo a las acciones toma-das por la OCS en su contra. (5)
A. Doctrina de actos propios
A través del Art. 7 del Código Civil, 31 L.P.R.A. sec. 7, se le concede a los tribunales la potestad de recurrir *172 a principios generales de derecho basados en equidad para resolver las controversias planteadas ante su considera-ción. De esta forma, en situaciones apropiadas, hemos in-corporado en nuestra jurisprudencia la regla de que nadie puede ir en contra de sus propios actos. Vivoni Farage v. Ortiz Carro, 179 D.P.R. 990 (2010); Int. General Electric v. Concrete Builders, 104 D.P.R. 871, 873-874 (1976).
Esta norma, calificada en latín como venire contra fac-tum propium non valet, permea todo nuestro comporta-miento y se encuentra fundamentada en la máxima que exige proceder de buena fe en “el desenvolvimiento de las relaciones jurídicas, el ejercicio de los derechos y el cum-plimiento de las obligaciones”. (Cita y comillas omitidas). Vivoni Farage v. Ortiz Carro, supra, pág. 1010. Mediante su aplicación, se salvaguardan intereses esenciales para lograr una interacción efectiva a todos los niveles de la vida diaria. Se espera que el devenir entre los miembros que componen la sociedad esté caracterizado por las cuali-dades de honestidad y sinceridad, de manera que en todo momento se pueda descansar en la veracidad de las mani-festaciones o las actuaciones de otro según se ha actuado. L. Diez-Picazo, La doctrina de los propios actos: un estudio sobre la jurisprudencia del Tribunal Supremo, Barcelona, Ed. Bosch, 1963, pág. 157.
Podemos deducir que, a través de la buena fe se protege la confianza que deposita una parte quien ha confiado razonablemente en una apariencia creada por otra. Int. General Electric v. Concrete Builders, supra. J. Puig Brutau, Estudios de derecho comparado: la doctrina de actos propios, Barcelona, Ed. Ariel, 1951, págs. 106-107.
Como bien señala el tratadista Gullón Ballesteros:
La regla según la cual no puede venirse contra los propios actos, negando todo efecto jurídico a la conducta contraria, se asienta en la buena fe o, dicho de otra manera, en la protec-ción a la confianza que el acto o conducta de una persona sus- *173 cita objetivamente en otra u otras. El módulo regulador es la objetividad, o sea, el entendimiento o significado que de acuerdo con los criterios generales del obrar en el tráfico jurí-dico ha de dársele a tal acto o conducta.
El centro de gravedad de la regla no reside en la voluntad de su autor, sino en la confianza generada en terceros, ni se trata (en tal regla) de ver una manifestación del valor de una decla-ración de voluntad negocial manifestada por hechos o actos concluyentes. No es la regla una derivación de la doctrina del negocio jurídico, sino que tiene una sustantividad propia, asentada en el principio de buena fe. A. Gullón Ballesteros en I. Sierra Gil de la Cuesta, Comentario del Código Civil, Barcelona, Ed. Bosch, 2000, T. 1, pág. 397.
Se entiende, por tanto, que “[l]a conducta contradictoria es una contravención o una infracción del deber de buena fe”. (Escolio omitido). Diez-Picazo, op. cit., pág. 143. Acorde con ello, hemos reconocido que esa conducta “no tiene lugar en el campo del Derecho, y debe ser impedida”. Int. General Electric v. Concrete Builders, supra, pág. 877. Véase, también, Vivoni Farage v. Ortiz Carro, supra.
El vedar que una persona vaya contra sus propios actos tiene como efecto el soslayar “toda la doctrina de declaración de voluntad para imponer directamente un efecto jurídico”. (Escolio omitido). Int. General Electric v. Concrete Builders, supra, pág. 877. “El propósito de la regla es mantener la relación jurídica como fue creada, no permitiendo al obligado su voluntaria contravención”. C.L. de Haro, Cuestiones prácticas, Los “actos propios” en la Jurisprudencia del Tribunal Supremo, 1 Rev. Der. Priv. (1914).
La aplicación de la doctrina de actos propios está sujeta a que concurran los factores siguientes:
(a) Una conducta determinada de un sujeto, (b) que haya engendrado una situación contraria a la realidad, esto es, apa-rente y, mediante tal apariencia, susceptible de influir en la conducta de los demás, y (c) que sea base de la confianza de otra parte que haya procedido de buena fe y que, por ello, haya obrado de una manera que le causaría un perjuicio si su con- *174 fianza quedara defraudada. Vivoni Farage v. Ortiz Carro, supra, págs. 1010-1011, citando a Int. General Electric v. Concrete Builders, supra. J. Puig Brutau, op. cit., pág. 112.
Cabe señalar que la doctrina de actos propios no aplica de forma general a las relaciones de partes privadas frente al Gobierno. Unicamente “bajo circunstancias apropiadas, un demandante pued[e] invocar contra el Estado la doctrina de los actos propios, impedimento en equidad y de buena fe”. (Escolio omitido). Berrios v. U.P.R., 116 D.P.R. 88, 98 (1985). Véase, también, Hernández, Romero v. Pol. De P.R., 177 D.P.R. 121, 141 (2009).
Cónsono con lo anterior, se excluyen de su ámbito aque-llas situaciones en las que se ven lesionados el interés y la política pública del Estado, así como los estatutos especia-les promulgados en pro del orden público. Véanse: Quiles v. Del Valle, 167 D.P.R. 458, 478 (2006); Morales v. Municipio de Toa Baja, 119 D.P.R. 682 (1987); J.R.T. v. Hosp. de La Concepción, 114 D.P.R. 372, 382—383 (1983).
Así, por ejemplo, en Morales v. Municipio de Toa Baja, supra, pág. 693, encontramos que “las violaciones a las le-yes, política pública y orden público [eran] tan tajantes..., que no [existía] cabida para la aplicación de los principios de equidad. Resolver en otra forma sería propiciar el craso incumplimiento por los funcionarios públicos de las leyes y reglamentos que rigen sus actuaciones”. (Citas y escolio omitidos).
B. Reglamentación de tarifas
Consistentemente, hemos reiterado que el negocio de seguros se encuentra revestido de un alto interés público por el rol vital que juega esa industria tanto en nuestra sociedad como en nuestra economía. Maderas Tratadas v. Sun Alliance et al., 185 D.P.R. 880 (2012); Integrand Assurance v. CODECO et al., 185 D.P.R. 146 (2012); S.L.G. Ortiz-Alvarado v. Great American, 182 D.P.R. 48 (2011). *175 Ese alto interés público al que se encuentra vinculado el negocio de seguros justifica, a su vez, la legislación que autoriza reglamentar las tarifas que las aseguradoras pue-den cobrarle a sus clientes. 19 Appleman, Insurance Law and Practice Sec. 10491, pág. 429 (1982).
El poder de reglamentar las tarifas en el campo de se-guros tradicionalmente se ha asentado en la necesidad de reducir, en lo posible, el fracaso de empresas dedicadas a este tipo de negocio. 1 Couch on Insurance 3d Sec. 2.8, pág. 2-44 (2009). Se ha reconocido que la competencia destruc-tiva de precios, experimentada entre aseguradoras, puede resultar en la insolvencia de algunas de ellas. S. Leibowitz, State Insurance Rate Regulation: a Coasian Perspective, 17 J.L. Bus. & Eth. 107, 108 (Winter 2011). No obstante, el enfoque de la reglamentación se ha movido para atender la exigencia de que las tarifas sean, a su vez, adecuadas desde el punto de vista del consumidor. La reglamentación de las tarifas persigue promover el bienestar social al im-pedir el uso de tasas excesivas, inadecuadas o injusta-mente discriminatorias. Couch on Insurance 3d, supra, Sec. 2.31, pág. 2-134. Véase, además, Appleman, supra, Sec. 10491, pág. 431.
Los estados tienen la facultad de escoger el método que consideren más adecuado para reglamentar y supervisar el negocio de seguros en su jurisdicción, con el propósito de proteger el interés público, establecer tarifas uniformes, poner en vigor las leyes pertinentes y velar porque las violaciones a la legislación en el campo de seguros , sean atendidas adecuadamente. Couch on Insurance 3d, supra, Sec. 2.7, pág. 2-40. Así pues, en cada estado la entidad reguladora asumirá una forma diferente y será dotada de las facultades propias conforme le hayan sido conferidas por el estatuto orgánico correspondiente. Id., pág. 2-41.
Nuestro ordenamiento dispone para la evaluación *176 gubernamental de los tipos de seguros permitidos a las aseguradoras. La autoridad de validar las tarifas reside en el comisionado de seguros. Según consignado, el Capítulo 12 del Código de Seguros tiene como propósito fomentar el bienestar público a través de la reglamentación de los tipos de seguros, de modo que estos no resulten “excesivos, in-adecuados ni injustamente desiguales”. Art. 12.010 del Có-digo de Seguros, 26 L.P.R.A. sec. 1201. Con el fin de hacer viable esta función reglamentaria, se implantó en Puerto Rico la exigencia de inscripción de tarifas, mediante la cual se les exige a las compañías aseguradoras someter ante el Comisionado de Seguros las tarifas que se proponen utili-zar para su evaluación, aprobación o modificación.
El Art. 12.050 del Código de Seguros, supra, específicamente, establece los requisitos para la inscripción de tipos y, en lo pertinente a este recurso, dispone:
(1) Todo organismo tarifador y todo asegurador autorizado deberá inscribir ante el Comisionado, antes de usarlos en Puerto Rico, excepto como se dispone en la sec. 1209 de este título, cada manual de tipos, listas de tipos, clasificación de riesgo, plan tarifario, programa de líneas múltiples según de-finido mediante reglamentación y cualquier otra regla de tipos que adoptare o usare, así como cualquier otra información con-cerniente a la aplicación y cómputo de los tipos que fija y use, y toda modificación de cualquiera de los anteriores que se pro-ponga usar...
Un asegurador podrá cumplir con su obligación de presentar tales tipos para cualquier clase o tipo de seguro, haciéndose miembro o suscriptor de un organismo tarifador que los haga para tal caso o tipo de seguro, y autorizando al Comisionado a aceptarlos del organismo tarifador en nombre de dicho asegurador. Disponiéndose, que en el caso de seguro de propie-dad, el asegurador deberá hacerse miembro o suscriptor de un organismo tarifador autorizado a presentar los tipos de dichos seguros ante el Comisionado. 26 L.P.R.A. sec. 1205.
Una vez sometida la inscripción, corresponde entonces al comisionado de seguros evaluar las tarifas propuestas en un periodo inicial de treinta días, prorrogable a sesenta días adicionales. No obstante, la inscripción no surtirá *177 efecto hasta que haya concluido el plazo dispuesto para su revisión. Art. 12.060(2)(a) del Código de Seguros, 26 L.P.R.A. sec. 1206(2)(a). Se considerará que la presentación sometida cumple con los requisitos estatutarios, a menos que esta sea denegada durante el periodo señalado. Art. 12.060(3) del Código de Seguros, 26 L.P.R.A. sec. 1206(3).
Igualmente, se le concede al comisionado la potestad de desreglamentar las tarifas que utilizarán las compañías aseguradoras. El procedimiento a seguir para cumplir con este propósito surge, específicamente consignado, en el Art. 12.080 del Código de Seguros, el cual dispone lo siguiente:
El Comisionado podrá suspender o modificar con arreglo a las reglas y reglamentos que adopte, o mediante orden el requi-sito de presentación en cuanto a cualquier clase de seguro, subdivisión o combinación del mismo, o en cuanto a clases de riesgos para los cuales los tipos prácticamente no pueden pre-sentarse antes de usarse o en cuanto a las clases de seguros para los cuales un estatuto federal no requiera tal presentación. Dichas órdenes, reglas o reglamentos serán da-dos a conocer a los aseguradores y organismos afectados. El Comisionado podrá llevar a cabo investigaciones que considere conveniente, para determinar si los tipos afectados por dicha orden reúnen los requisitos de la sec. 1204(1)(b) [y] (c) de este título. (Énfasis nuestro). 26 L.P.R.A. sec. 1208 (Artículo 12.080 del Código de Seguros).
C. Procedimiento sumario
Excepto que su ley orgánica disponga lo contrario, la Ley Núm. 170 de 12 de agosto de 1988, según enmendada, conocida como Ley de Procedimiento Administrativo Uniforme de Puerto Rico (LPAU), 3 L.P.R.A. sec. 2101 et seq., faculta a las entidades administrativas a disponer de los asuntos ante su consideración mediante resolución sumaria. Sec. 3.7(b) de la LPAU, 3 L.P.R.A. sec. 2157(b).(6) Este mecanismo persigue agilizar el proceso ad- *178 judicativo en casos en los que no estén presentes hechos materiales en controversia. Comisionado Seguros P.R. v. Integrand, 173 D.P.R. 900 (2008). “Nada impide que [una agencia] pueda adjudicar sin celebrar una vista evidencia-ría cuando no exista controversia sobre los hechos y, ade-más, toda la evidencia documental que surge del expe-diente señale claramente la corrección de la determinación de la agencia...”. (Énfasis en el original). Mun. de San Juan v. CRIM, 178 D.P.R. 163, 179 (2010). De este modo se evita el tener que celebrar una “audiencia evidenciaría [que] no aportaría ningún elemento meritorio al proceso analítico”. J. Echevarría Vargas, Derecho administrativo puertorriqueño, San Juan, Ed. Situm, 2012, pág. 231.
D. Revisión administrativa
La revisión de las determinaciones administrativas se fundamenta en el principio de deferencia judicial. Mediante esta norma reconocemos el expertise del que gozan los organismos administrativos en aquellas materias que le han sido delegadas por ley. The Sembler Co. v. Mun. de Carolina, 185 D.P.R. 800 (2012); Batista, Nobbe v. Jta. Directores, 185 D.P.R. 206 (2012); IFCO Recycling v. Aut. Desp. Sólidos, 184 D.P.R. 712 (2012); Torres Santiago v. Depto. Justicia, 181 D.P.R. 969 (2011).
Conforme provisto en la See. 4.5 de la LPAU,(7) no intervendremos con las determinaciones de hechos formuladas por una agencia, siempre que estas se encuentren sustentadas por evidencia sustancial que forme parte del expediente administrativo. A contrario sensu, las conclusiones de derecho de un ente administrativo podrán ser examinadas por el foro judicial en todos sus aspectos. The Sembler Co. v. Mun. de Carolina, supra; Batista, Nobbe v. *179 Jta. Directores, supra; Ifco Recycling v. Aut. Desp. Sólidos, supra; Torres Santiago v. Depto. Justicia, supra.
“La deferencia reconocida a las decisiones de las agencias administrativas habrá de ceder, solamente, cuando no esté basada en evidencia sustancial, cuando la agencia haya errado en la aplicación de la ley y cuando su actuación resulte arbitraria, irrazonable o ilegal”. The Sembler Co. v. Mun. de Carolina, supra, pág. 822. Véase Torres Santiago v. Depto. Justicia, supra.
Ill
Universal sostiene que, mediante sus expresiones y ac-ciones, el Comisionado García creó la apariencia de la des-reglamentación de las tarifas a base de lo cual, y proce-diendo de buena fe, negoció con sus clientes. Por lo tanto, argumenta que le está vedado al comisionado de seguros de turno ir contra esas representaciones. Alega, además, que las actuaciones de los comisionados subsiguientes le han expuesto a un perjuicio económico.
Para sustentar su posición, acompañó sus escritos so-metidos ante la agencia administrativa con copia de artí-culos de periódicos y comunicaciones de la OCS alusivos al tema. Igualmente, sometió una “Declaración Jurada” sus-crita por el comisionado auxiliar Ramón L. Cruz Colón (Co-misionado Auxiliar Cruz), quien ocupó ese puesto en la OCS desde mediados del 1997 hasta marzo de 2001. En esta indica que, mientras el Comisionado García ocupó su cargo, en reiteradas ocasiones manifestó su interés en des-reglamentar el mercado de seguros comerciales en Puerto Rico. Esto es, permitir a las aseguradoras cobrar las pri-mas que estimasen convenientes sin necesidad de adhe-rirse a las tarifas sometidas y aprobadas por la OCS. Igual-mente, expresó que el Comisionado García había dado a conocer su intención de no fiscalizar la práctica, que para *180 entonces alegadamente era común entre las aseguradoras, de otorgar descuentos no contemplados en los manuales de tarifación vigentes mientras formalizaba la desregla-mentación. A esos efectos, el Comisionado García inicial-mente le solicitó al Comisionado Auxiliar Cruz trabajar en un anteproyecto de ley para modificar el Capítulo 12 del Código de Seguros y, posteriormente, le requirió preparar el correspondiente proyecto de reglamentación.
Teniendo como cierta la documentación que consta en autos, no cabe duda de que el Comisionado García, tanto en privado como en público, reveló “su intención de desre-glamentar el mercado de seguros comerciales en Puerto Rico”. Es decir, favoreció la libre competencia como meca-nismo tarifario por encima del requisito estatutario de aprobación previa. Su filosofía, basada en la liberalización del mercado, proponía que al disputarse los clientes entre sí las aseguradoras ajustarían los precios de sus primas a favor del consumidor.
No obstante, acorde a la propia evidencia sometida por Universal, el Comisionado García estaba consciente de que establecer el sistema de libre competencia, conforme a lo dispuesto en el Art. 12.080 del Código de Seguros, supra, requería “suspender o modificar con arreglo a las reglas y reglamentos que adopte, o mediante orden el requisito de presentación” implantado por el Capítulo 12 del Código de Seguros, el cual regía entonces y aún continúa en vigor, y exige que las tarifas sean sometidas previamente para su aprobación. Ese artículo exige, a su vez, que cualquier or-den, regla o reglamento a esos efectos tiene que ser infor-mado por la OCS a las aseguradoras. A base de la declara-ción jurada sometida por Universal, podemos deducir que con este propósito el Comisionado García gestionó, a través del Comisionado Auxiliar Cruz, la redacción de un antepro-yecto y la reglamentación correspondiente. Sin embargo, durante la incumbencia del Comisionado García, nunca se *181 efectuó el cambio deseado mediante orden, reglamento o enmienda alguna al Código de Seguros.
Igualmente, la evidencia apunta a que el Comisionado García tenía conocimiento de que, en efecto, muchas ase-guradoras no se estaban adhiriendo a las tarifas en vigor. Sin embargo, optó por no implantar las disposiciones del Código de Seguros que penaliza esta práctica, mientras procuraba lograr los cambios correspondientes al ordena-miento vigente. Así lo reconoce el Comisionado Auxiliar Cruz en su declaración jurada al manifestar lo siguiente: "[a] la vez, señaló el [Comisionado] García que la OCS no estaba fiscalizando dicha situación y que permanecería sin fiscalizarla mientras procedía con el desarrollo de la reglamentación necesaria para formalizar la referida desregla-mentación en Puerto Rico”. (Enfasis nuestro).
Sobre este particular, encontramos reveladora la con-sulta propuesta por Ace Insurance Company (AIC) a la OCS en febrero de 2000(8) y la contestación de esta última fechada el 26 de abril de 2000,(9) específicamente, en torno al requisito de un trámite formal para hacer viable la des-reglamentación sometida en autos por Universal. Cabe no-tar que, en su comunicación, AIC da por sentado que debe existir algún tipo de notificación por parte de la OCS y enmendarse el estado de derecho vigente para poder im-plantar el sistema de libre competencia.
En su respuesta a AIC, el Comisionado García reconoce la necesidad de una acción formal de su parte para lograr el nuevo enfoque. De igual forma admite la práctica de las aseguradoras de no adherirse a los tipos registrados en la OCS y no descarta la posibilidad de que estas se hallen incursas en violación de ley. De otra parte, simplemente propone la posibilidad de que el beneficio redundante al consumidor, como resultado de la competitividad en el mer- *182 cado, se considere como una circunstancia mitigante a la pena a ser impuesta por esa infracción.
En síntesis, conforme surge de los autos, la filosofía del Comisionado García, para la época de las penalidades ar-gumentadas en este recurso, se centró en gestionar la des-reglamentación oficial con el propósito de liberalizar el sis-tema tarifario en el campo de los seguros en Puerto Rico. Cónsono con este enfoque optó, entre tanto, por ejercer su discreción al no poner en vigor las disposiciones del Código de Seguros sobre este particular. No obstante, bajo el man-dato del Comisionado García en ningún momento quedó sin efecto el requisito de aprobación previa de tarifas, se-gún consignado en el Capítulo 12 del Código de Seguros. Simplemente, durante ese periodo en particular, se dio la práctica administrativa de no poner en vigor la normativa vigente.
Ciertamente aparecieron publicadas en la prensa múl-tiples manifestaciones del Comisionado García haciendo referencia a la desreglamentación del mercado y al hecho de que las aseguradoras se estaban apartando de las tari-fas aprobadas por la OCS. Igualmente, ello se encuentra sustentado por las declaraciones del Comisionado Auxiliar Cruz que obran en el expediente. No obstante, la ley es clara a los efectos de que, excepto que medie una enmienda al propio estatuto, la modificación o eliminación de las ta-rifas debe venir acompañada de una actuación formal por parte de la OCS, ya sea a través de una orden o un reglamento. Esa determinación, a su vez, debe ser debida-mente notificada a las partes afectadas lo que necesaria-mente implica las aseguradoras.
En el contexto de este caso, no nos parece razonable el que Universal descansara enteramente en expresiones ver-bales del Comisionado García atinentes a la desreglamen-tación sin ocuparse de verificar si esa posición estaba sus-tentada, ya fuese por una enmienda a las disposiciones del Código de Seguros o por alguno de los mecanismos provis-tos en su Art. 12.080, supra.
*183 El mero hecho de que un oficial público haga expresio-nes sobre un alegado estado de derecho no releva a la parte afectada de hacer gestiones claramente a su alcance para cotejar su certeza. No podemos olvidar que se trata de una aseguradora que, por la naturaleza altamente reglamen-tada del negocio al cual se ocupa, tiene que estar al tanto de las tarifas en efecto para sus productos, así como el procedimiento exigido en ley para la dispensa de estas. En otras palabras, esta se considera conocedora del impera-tivo estatutario provisto en el Art. 12.080 del Código de Seguros, supra, el cual dispone, como requisito esencial para el relevo de presentación de tarifas, que medie ya sea una orden escrita o reglamentación que así lo acredite.
Más aún, la obligación de notificar cualquier exención atinente a las tarifas “a los aseguradores y organismos afectados” consta taxativamente como parte del Ait. 12.080 del Código de Seguros, supra. Por ende, Universal debía conocer que cualquier cambio tarifario efectuado por el Co-misionado de Seguros, según esta disposición estatutaria le hubiese sido informado por la OCS.
Por otro lado, declinamos emplear la doctrina de actos propios en este caso. Reiteramos, de este modo, el principio de la aplicación limitada de esta norma de equidad frente al Estado disponible, únicamente, por vía de excepción y en circunstancias de naturaleza única.
En términos procesales, entendemos que actuó correcta-mente la OCS al resolver el caso mediante la vía sumaria. Conforme a la investigación realizada por la OCS en el caso de autos, durante el periodo en cuestión Universal cobró primas de seguros de propiedad para condominios que estaban ya fuese por encima o por debajo de las regis-tradas en la OCS. Este hecho resulta irrefutable de la prueba sometida por la OCS en el procedimiento adjudicativo.
Surge claramente de los autos que la prueba utilizada por la OCS para sustentar las alegadas violaciones al Có- *184 digo de Seguros descansa, esencialmente, en información sometida por la propia peticionaria como parte del proceso de investigación iniciado por la OCS, relativo a las primas cobradas por Universal a sus clientes en el periodo de tiempo señalado. Una vez sometida la información por Universal, las primas fueron comparadas con las tarifas que la agencia entendía continuaban en vigor.(10)
Ante este escenario fáctico, no existía razón alguna para la OCS llevar a cabo algún tipo de proceso evidenciarlo.
IV
A base de lo antes expuesto, resolvemos que la determi-nación de la Oficina del Comisionado de Seguros de 7 de diciembre de 2007 no resulta arbitraria o irrazonable y se encuentra sustentada en derecho. Por consiguiente, se con-firma la Sentencia del Tribunal de Apelaciones.

Se dictará Sentencia de conformidad.

La Jueza Asociada Señora Fiol Matta no intervino.

 Ello contraviene los Arts. 12.130, 27.090(1) y (2), y 27.160(2) y (3) del Código de Seguros de Puerto Rico (Código de Seguros), 26 L.P.R.A. secs. 1213, 2709(1) y (2), y 2716(2) y (3), respectivamente, para entonces vigentes. Según la Ley Núm. 230-2008 (26 L.P.R.A. sec. 235), la prohibición de rebajas e incentivos no autorizados se encuentra ahora codificada en el Art. 27.100 del Código de Seguros, 26 L.P.R.A. sec. 2710, mientras que lo atinente al cobro ilegal de primas aparece plasmado en el Artículo 27.160 del Código de Seguros, 26 L.P.R.A. sec. 2716.

 Esta disposición fue posteriormente enmendada por el Art. 7 de la Ley Núm. 263-2008 (26 L.P.R.A. sec. 251).

 El Sr. Juan Antonio García (q.e.p.d.) laboró en calidad de Comisionado de Seguros en diferentes ocasiones, siendo la última en febrero de 1993 hasta febrero de 2001. Según indicado anteriormente, la investigación pertinente a este recurso cu-brió el periodo entre enero de 1996 hasta junio de 2001.

 Aunque inicialmente la petición de certiorari fue declarada “no ha lugar” mediante Resolución de 18 de noviembre de 2010, posteriormente, el 24 de enero de 2011 acordamos acoger el recurso en reconsideración.

 Hoy nos limitamos a atender el error indicado, según señalado en el “Alegato de la Parte Peticionaria”, excluyendo de este modo la consideración de la defensa de “entrampamiento” en su vertiente civil administrativa, presentada por vez primera ante este Foro como parte de ese alegato. Igualmente, declinamos acoger otros plan-teamientos traídos por primera vez a nuestra atención mediante la “Réplica al Ale-gato del Recurrido Comisionado de Seguros de Puerto Rico” sometida por Universal. Véanse, por ejemplo: Abengoa, S.A. v. American Intl. Ins., 176 D.P.R. 512, 526 (2009), y Echandi Otero v. Stewart Title, 174 D.P.R. 355, 383 esc. 15 (2008).

 En Comisionado Seguros P.R. v. Integrand, 173 D.P.R. 900 (2008), resolvimos que la Oficina del Comisionado de Seguros (OCS) está facultada para valerse de esta vía procesal cuando no medien controversias de hechos materiales.

 3 L.P.R.A. sec. 2175.

 Petición de certiorari, Apéndice, pág. 142.

 Id., pág. 140.

 La información pertinente a la diferencia entre las primas cobradas por Universal y las tarifas aprobadas por la OCS aparece detallada en los Anejos I y II de la Orden de 8 de mayo de 2002, así como en los Anejos 1 y 2 de la “Moción para que se Dicte Resolución Parcial Sumaria” sometida por la OCS. También se recoge, a su vez, en los dictámenes de la OCS aquí recurridos.